IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DARRELL BUCK, SHAMUS WATSON, and
WILLIAM CATLETT, Each Individually and
on Behalf of All Others Similarly Situated   PLAINTIFFS

v.   CASE NO. 2:22-CV-2153-PKH

WESTWIND AND ASSOCIATES, INC.
and MARK ECCLESTON                           DEFENDANT

DEPOSITION OF SHAMUS WALTER WATSON

    Taken by videoconference, on July 3, 2023, at
10:22 a.m.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:
MR. DANIEL FORD
SANFORD LAW FIRM, PLLC
Kirkpatrick Plaza
10800 Financial Center Parkway, Suite 510
Little Rock, Arkansas 72211
daniel@sanfordlawfirm.com

ON BEHALF OF THE DEFENDANTS:
MR. CHRISTOPHER HOOKS
ROBERTSON, BEASLEY, SHIPLEY & ROBINSON, PLLC
315 North Seventh Street
Fort Smith, Arkansas 72901
chooks@rbsr-attorneys.com



*Wilcox* Court Reporting

*Realtime-Certified Court Reporting and Captioning*
(479) 253-1875 - wilcoxcourtreporting@gmail.com
www.wilcoxcourtreporting.net



EXHIBIT
5

1                          I N D E X

2                                                    PAGE

3   APPEARANCES ...................................2

4   EXHIBITS ......................................2

5   CERTIFICATE .................................101

6   TESTIMONY OF SHAMUS WALTER WATSON

7   Examination by Mr. Hooks .........................3
    Examination by Mr. Ford .........................90
8   Examination by Mr. Hooks ........................98

9

10                       E X H I B I T S

11  NO.       DESCRIPTION                          PAGE

12
      1    Independent Contractor Agreement        32
13
      2    Invoices                                38
14
      3    Plaintiff Shamus Watson's Responses to  72
15         Defendants' First Set of Requests for
           Admissions
16
      4    Invoices                                72
17
      5    May Checks                              77
18
      6    June Checks                             77
19
      7    Plaintiff Shamus Watson's Answers and   87
20         Responses to Defendants' First Set of
           Interrogatories and Requests for Production
21         of Documents

22

23                  Reporter's notes:

24  1.  Quoted material is as read and not verified.
    2.  Phonetic spellings are signified by [ph].
25  3.  Exactly as stated are signified by [sic].
    4.  Interruptions and over-speaking are signified by
           Susan Wilcox, AR-CCR #629, MO-CCR #1082, NVRA CVR/RVR #66391661

```
 1   dashes (--).
     5.   Audio malfunctions in videoconferenced depositions
 2   can be caused by technical difficulties or
     over-speaking.
 3   6.   Transcripts are not allowed to be provided to
     another party without express written consent of the
 4   reporter.

 5               S T I P U L A T I O N S

 6          The deposition of SHAMUS WALTER WATSON, in

 7   the above-styled cause was taken before Susan Wilcox,

 8   CCR, a Supreme Court-certified court reporter within

 9   and for Sebastian County, Arkansas, by videoconference,

10   on July 3, 2023, at 10:22 a.m., pursuant to Arkansas

11   Rules of Civil Procedure.

12               P R O C E E D I N G S

13               SHAMUS WALTER WATSON

14          Having been called for examination by counsel

15   for the DEFENDANT, and having been first duly sworn,

16   was examined and testified as follows.

17          EXAMINATION BY COUNSEL FOR DEFENDANT

18   BY MR. HOOKS:

19   Q.   Good morning, Mr. Watson.  My name is Christopher

20   Hooks.  And I represent the defendant Westwind and Mark

21   Eccleston in a lawsuit that you filed against them

22   under the fair Labor Standards act for unpaid --

23   alleged unpaid wages and overtime wages.  Are you

24   familiar with that lawsuit?

25   A.   Yes, sir.
```

1  Q.   And before we get too far into it, I appreciate

2  you joining us today.  I know it's a little bit

3  complicated when it's over Zoom.  But can you -- can

4  you hear me, okay?

5  A.   Yes, I can.

6  Q.   Okay.  Good deal.  And, before we get too far into

7  it today, I just want to go over a few ground rules for

8  this deposition.

9       Have you ever given a deposition before?

10 A.   No, I don't think so.  No.

11 Q.   Okay.  Well, again, just a few ground rules.  So

12 we have a court reporter that is on this call with us.

13 And she is -- she's going to be taking down the

14 questions I ask you and the answers that you give me.

15      So, if you would, you know, we need verbalized

16 responses.  You know, she can't record, you know, head

17 nods or "uh-huh" or "huh-uh" statements.  So we want a

18 good clean record for today.  So, if you would, please

19 verbalize your responses to the questions I give you.

20 Are you going to be able to do with that for us today?

21 A.   Yes, sir.

22 Q.   Okay.  I appreciate it.  And if there is a

23 question that I ask of you that you're not sure of or

24 if you don't understand my question, just ask me to

25 repeat it or rephrase it.  And I'd be happy to do so.

1   A.   Yes, sir.

2   Q.   And, if you need to take a break -- go to the

3   restroom, anything like that -- just let me know.   And

4   we will go off the record so you can -- so you can do

5   that, okay?

6   A.   Yes, sir.

7   Q.   Okay.   Alrighty.   So you -- I believe you

8   currently stated earlier, that you are logged into this

9   deposition -- Zoom deposition from Magazine, Arkansas?

10  A.   Yes, sir.

11  Q.   And at 342 East County Road, is at your current

12  address?

13  A.   Yes.   I just moved here into a new house.

14  Q.   Congratulations.   Did you buy or are you renting?

15  A.   Buying.

16  Q.   Oh, boy.   Buying in this market.   That's tough?

17  A.   Yeah.

18  Q.   And I don't think I asked you this earlier.

19       But would you go ahead and stayed your full name

20  for the record today?

21  A.   Shamus Watson.

22  Q.   Do you have a middle name?

23  A.   Walter.

24  Q.   I appreciate it.

25       What is your date of birth, Shamus?

```
 1   A.    It is 03/07/1993.

 2   Q.    And you said you just moved to 342 East County

 3   Road address.

 4         Where did you live prior to that?

 5   A.    854 (audio malfunction) --

 6   Q.    What town was that in?

 7   A.    Magazine.

 8   Q.    And that's Logan County, isn't it?

 9   A.    Yes, sir.

10              THE COURT REPORTER:  I'm sorry to

11         interrupt.

12              What was the name of your road, Shamus?

13         It kind of bleeped out on my end.

14              THE WITNESS:  The one I currently live

15         at?

16              THE COURT REPORTER:  The name of your

17         prior road.  Your prior road.

18              THE WITNESS:  Okay.  It is Paint Rock

19         Road.

20              THE COURT REPORTER:  Thank you so much.

21         I apologize.

22              THE WITNESS:  You're welcome.

23   BY MR. HOOKS:

24   Q.    And so how long have you been a resident of Logan

25   County?
```

| | |
|---|---|
| 1 | A.   My whole life. |
| 2 | Q.   So for approximately -- |
| 3 | A.   About 30 years. |
| 4 | Q.   And whenever you worked for Westwind, were you at |
| 5 | that -- I'm sorry -- was it Paint -- Paint Rock Road |
| 6 | address? |
| 7 | A.   Yes.  Yes. |
| 8 | Q.   Are you married, Mr. Watson? |
| 9 | A.   Yes, sir. |
| 10 | Q.   What is your wife's name? |
| 11 | A.   Allissa Watson.  Hers is A-L- -- |
| 12 | Q.   Do you guys -- |
| 13 | A.   Her name is spelled A-L-L-I-S-S-A. |
| 14 | Q.   Thank you. |
| 15 |      When did you guys marry? |
| 16 | A.   2019, I believe.  I know it was about four years |
| 17 | ago. |
| 18 | Q.   I'm putting you on the spot there. |
| 19 | A.   Yeah. |
| 20 | Q.   Okay.  Do you guys have any children? |
| 21 | A.   Yes.  We have one right here. |
| 22 | Q.   Okay.  Very nice.  Very nice. |
| 23 |      What is your child's name? |
| 24 | A.   His name is Kason. |
| 25 | Q.   Kason.  How old is Kason? |

1  A.    He's a year and three months.

2  Q.    A year and three months.

3        So probably not quite old enough to hike Mount

4  Magazine, is he?

5  A.    No, not yet.

6  Q.    It sure is pretty up there.

7  A.    Oh, yeah.  I love it.

8  Q.    Do you and your wife hike it pretty often?

9  A.    When we get a chance to.

10  Q.    And what is the name of that lake that's -- that's

11  at the bottom of that mountain; I forget the name of

12  it.

13  A.    Are you talking about Blue Mountain?

14  Q.    Maybe.  I just -- my wife and I will go up to

15  Mount Magazine Lodge every so often.  And, I know on

16  the way up, there is -- I'm assuming it's a lake that's

17  kind of at the base of the mountain.

18  A.    Yeah.  I think that's Blue Mountain Lake.

19  Q.    And I always see a bunch of people on

20  side-by-sides and whatnot going off-roading around

21  there.

22  A.    Oh, yeah.

23  Q.    Do you do any of that?

24  A.    Oh, yeah.  I go mudding a lot.

25  Q.    Any other hobbies of yours?

```
 1   A.    Swimming, mudding, drag racing.

 2   Q.    Drag racing?

 3   A.    Yeah.

 4   Q.    Is there -- is there a track around -- around

 5   there?

 6   A.    Yeah.  Centerville.

 7   Q.    Centerville.  And what type of car do you use for

 8   that?

 9   A.    It's a '98 Mustang Cobra.

10   Q.    Do you, you know, tinker with the engine and, you

11   know, customize the engine yourself, or what all do you

12   do to --

13   A.    Yeah.

14   Q.    -- get that ready to go?

15   A.    I just do the engine myself.

16   Q.    How fast can you get that thing running?

17   A.    I think about 160 so far.

18   Q.    And, I guess, you have the parachute on the back

19   of it?

20   A.    Yeah.  We don't use it at that track, though,

21   because it's not big enough, really.

22   Q.    Okay.  That seems kind of scary.

23   A.    It is.  But it's fun.

24   Q.    And so -- I mean, do you rebuild the engines, or

25   tell me a little bit about that?
```

1    A.    Well, whenever they -- whenever we notice a noise,

2    me and a buddy will rebuild it and then put it back out

3    on the track again.

4    Q.    So you are probably pretty good with your hands,

5    is what you are getting at?

6    A.    Oh, yeah.

7    Q.    So you -- I'm assuming you like to take stuff

8    apart and put it back together?

9    A.    Always.

10   Q.    Other than engines, do you do any carpentry work,

11   or what else are you taking apart and putting back

12   together?

13   A.    Audio systems.

14   Q.    You probably have a pretty good sound system in

15   your vehicle, don't you?

16   A.    Both of them; yes, I do.

17   Q.    Other than that Mustang, what else do you drive?

18   A.    I've got a four-wheel-drive Ford Ranger and a 2002

19   Chevy Tahoe.   And then I have an '85 K-5 Blazer that is

20   my -- my mud buggy.

21   Q.    So you've almost got one for every day of the

22   week, don't you?

23   A.    I'm trying.

24   Q.    You are almost there.

25   A.    Yeah.

1   Q.   When do you guys race your -- or do your drag

2   racing out at Centerville?

3   A.   Every Saturday.

4   Q.   And, I'm assuming, it's open to the public to come

5   watch?

6   A.   Yeah.

7   Q.   Going to have to find a Saturday to come on down

8   there.  Find something to do.  There's --

9        All right.  So, Mr. Watson, tell me a little bit

10  about your educational background?

11  A.   Well, I mean, I graduated high school.

12  Q.   Were you a --

13  A.   Do what?

14  Q.   Were you a Rattler?

15  A.   Yeah.  I graduated from Magazine in 2012.

16  Q.   In 2012?

17  A.   Yeah.

18  Q.   Did you play any sports?

19  A.   I played football my whole life.

20  Q.   You all were pretty good around in the early

21  2010s, weren't you?

22  A.   Oh, yeah.

23  Q.   Y'all -- didn't y'all make state in 2010?

24  A.   Yeah, we won state championship.

25  Q.   Y'all played Carlisle, didn't you?

1   A.    Yeah.

2   Q.    I grew up about 15 minutes down the road from

3   Carlisle.  I --

4   A.    That's crazy.

5   Q.    I was actually at that game.  I have a deer

6   hunting buddy in Carlisle that was playing in that

7   game.  Y'all had a couple -- y'all had a couple of

8   really fast running backs.

9   A.    Yeah.

10   Q.    What position did you play?

11   A.    I was a running back.

12   Q.    So you must have been one of them, then.

13        So you graduated in 2012.

14        Were you in FFA in high school or any -- any

15   association, like that?

16   A.    No, I wasn't.

17   Q.    Any type of welding association or welding class?

18   A.    No, I wasn't.

19   Q.    So, after you graduated Magazine High School, did

20   you go to college?

21   A.    I tried to.  I tried to go to college for what I

22   wanted to do.  But every time I take the test, I would

23   miss it by one point to go.

24   Q.    And what did you want to do after high school?

25   A.    Airplane mechanic.

1   Q.   And where -- where would you take that test to get

2   into airplane mechanic school at?

3   A.   Spartan College of Aerodynamics in Oklahoma.

4   Q.   Where at in Oklahoma was that; do you remember?

5   A.   I forget the town.  I'm trying to think of the

6   town name, but I forget.

7   Q.   And, so, did you -- did you take that airplane

8   mechanics test right after you graduated high school?

9   A.   It was a couple of months after I graduated.  But

10  I took it, like -- I took it twice.  I missed it by one

11  point both times.  And then just decided to just go to

12  work.

13  Q.   So that would have been roughly end of 2012,

14  beginning of 2013?  So, after you --

15  A.   Yeah.

16  Q.   -- after you failed the airplane mechanic's test,

17  where did you go to work at?

18  A.   I think, McDonald's for a little while.

19  Q.   Is that the McDonald's in Paris or the one and

20  Magazine?

21  A.   No.  The one in Booneville.

22  Q.   Booneville?

23  A.   Yeah.  It's, like, 10 minutes away from Magazine.

24  Q.   And, I know it's hard to remember exact dates, but

25  do you know roughly how long you were at McDonald's

1  there?

2  A.    About six to eight months or something like that.

3  Q.    And where did you -- where did you go to work

4  after McDonald's?

5  A.    I went to go work on a farm.

6  Q.    Is that farm in Magazine?

7  A.    Yeah.

8  Q.    And do you recall the individual's name that you

9  worked for there?

10 A.    His name is Bill Pettway [ph].

11 Q.    I'm sorry.  I didn't get that last name, Shamus?

12 A.    Pettway.

13 Q.    Can you spell that for us?

14 A.    I'm not really sure how to spell his last name,

15 honestly.

16 Q.    And what type of work did you do for Mr. Pettway?

17 A.    I bailed hay, worked on tractors, fed cows and

18 horses and stuff like that.

19 Q.    You probably worked some pretty long hours there,

20 didn't you?

21 A.    Oh, yeah.

22 Q.    Did you ever have to repair tractors?

23 A.    Every once in a while.

24 Q.    Did you ever have to weld gates or anything like

25 that?

1   A.   Yeah.

2   Q.   And when did you learn how to weld?

3   A.   When I started working with Bill Pettway.

4   Q.   So he taught you how to weld out there?

5   A.   Yeah.

6   Q.   So that would have been, I guess, roughly 2014?

7   A.   Yep.

8   Q.   And how long did you work for Mr. Pettway?

9   A.   I'm going to say, roughly, about three years.

10  Q.   So about 2017; does that sound about right?

11  A.   Yeah.

12  Q.   And why did you stop working for him?

13  A.   Because he sold his farm and everything, so...

14  Q.   You went on your way?

15  A.   Yep.

16  Q.   Okay.  I know this seems a little bit redundant,

17  but I'm just trying to get a little bit of background

18  on you.

19       So, after -- after you left Mr. Pettway's farm,

20  where did you go to work after that?

21  A.   I'm trying to think.  I went to Rockline for a

22  little bit, and that is there in Booneville.

23  Q.   Were you working, I guess, in their factory there?

24  A.   Yeah.

25  Q.   And were you making, I guess, filters -- paper

1    filters?

2    A.    No.   That was -- I was making baby wipes.

3    Q.    What was your job title at Rockline?

4    A.    I was an operator.

5    Q.    Tell me a little bit about what an operator at

6    Rockline does?

7    A.    Basically, just make sure that the line and

8    everything is running right.

9    Q.    When you say "line," are you referring to a

10   conveyor belt or assembly line or -- flesh that out for

11   me.

12   A.    Assembly line/conveyor belt.   Everybody is on the

13   line, which is the -- where the baby wipes come

14   through.   And I got to make sure the machines are

15   running right.   And I had to make sure that everybody

16   was good and give people breaks.

17   Q.    So, if a machine wasn't working, it was your job

18   to repair it?

19   A.    No.   I would have to get ahold of maintenance.

20   Q.    Did Rockline require you to have any type of

21   certifications or licenses when you were working out

22   there?

23   A.    No.

24   Q.    Did you ever have to weld anything when you were

25   working at Rockline?

1    A.    No.

2    Q.    And I didn't ask you this earlier:  But did you go

3    to welding training school or anything like that?

4    A.    No, I did not.

5    Q.    Just learning on the job with Mr. Pettway?

6    A.    Yep.

7    Q.    What all types of welding did he have you doing

8    out there?

9    A.    MIG, TIG, and that's it.

10    Q.    No arc welding?

11    A.    No.

12    Q.    Okay.  So when you were at Rockline, were you

13    responsible for other employees out there, or were you

14    just responsible for making sure everything was running

15    smoothly?

16    A.    Mostly make sure everything was running smoothly.

17          But, like I said, every once in a while, I would

18    give people breaks and take over their spot for about 5

19    to 10 minutes, so they could go to the bathroom.

20    Q.    Were you a W-2 employee for Rockline?

21    A.    Yeah.

22    Q.    So they took taxes out of your paycheck?

23    A.    Yes.

24    Q.    Do you recall at Rockline how often you were paid?

25    A.    Every two weeks.

1  Q.   When did your employment with Rockline end?

2  A.   Around the middle of 2018.

3  Q.   And who was your supervisor at Rockline?

4  A.   I forget.

5  Q.   And why did you -- why did you leave Rockline?

6  A.   I got sick.  And, like, I was super sick.  And

7  for, I'm going to say, a period of months, I was really

8  sick, so -- and they just told me that, if I can't come

9  back to work, then, you know, there's nothing that they

10  can do for me anymore.

11  Q.   So that was pretty much the end of it.  You just

12  got sick and --

13  A.   Yeah.

14  Q.   -- that was the end of your employment?

15  A.   Yep.

16  Q.   Did they ever give you, like, an official letter

17  saying "your employment has ended" or anything like

18  that?

19  A.   Yeah.

20  Q.   And that was -- that was a little bit before COVID

21  got here.

22       What type of sickness did you have?

23  A.   I don't know.  I was just -- I was just -- I was

24  weak all the time.  I couldn't hardly move out of bed

25  or anything.  Like, it was weird.

1   Q.   So, after -- after Rockline, where did you go to

2   work after that?

3   A.   I went to -- oh, my God.   I forgot the name of

4   that company.   It is something roofing.   I was doing --

5   putting siding and roofs on houses.

6   Q.   Do you recall where they were based out of?

7   A.   Fort Smith.

8   Q.   Would that have been, roughly, mid-2018?

9   A.   Right at the end of 2018.

10   Q.   So you were putting siding on houses.   You weren't

11   getting up on the roofs, were you?

12   A.   I was, putting -- yeah, I was getting on roofs to

13   put the roofs on.

14   Q.   Okay.   So you were replacing roofs.

15        That's a hot job, isn't it?

16   A.   Oh, yeah.

17   Q.   So was your title just roofer, or were you a

18   foreman?

19   A.   I was just a roofer.

20   Q.   About how long did you do that job?

21   A.   Until right in the middle of 2019.

22   Q.   So, about the time summer rolled around, you said,

23   "I had enough of that"?

24   A.   Yeah.

25   Q.   How big of an area would you guys cover?

1   A.   Plus -- 50 miles.

2   Q.   So, 50-mile radius around Fort Smith?

3   A.   Yeah.

4   Q.   So would you drive from Magazine to Fort Smith

5   every day for work?

6   A.   Yeah.  Yeah.

7   Q.   And then, I'm assuming -- well, scratch that.

8        Would you meet at, like, a shop or an office and

9   then get dispatched to a job?

10  A.   We would meet at a store.  And I would get in the

11  company truck, and we would go to the job site.

12  Q.   So you weren't driving your personal vehicle to

13  job sites?

14  A.   No.  No.

15  Q.   And that roofing job, do you recall who your

16  supervisor was?

17  A.   His name was John.  But I forget his last name.

18  Q.   John Brothers?

19  A.   No.  God, I forget his last name.  I don't

20  remember.  I don't know.

21  Q.   When you were with this roofing company, how did

22  you get paid?

23  A.   I got paid every week by a paycheck.

24  Q.   Did they take taxes out of your paycheck; or were

25  you just paid straight --

```
 1    A.    Yeah.

 2    Q.    -- no taxes?

 3    A.    Yeah, they took taxes out.

 4    Q.    Paid hourly?

 5    A.    Yeah.

 6    Q.    How much did you make per hour?

 7    A.    Sixteen.

 8    Q.    They weren't paying you very much.

 9    A.    No.

10    Q.    There's a lot of money in the roofing business.

11    A.    Oh, yeah.

12    Q.    All right.  So you left the roofing company in

13    2019 -- middle of 2019.  Why did you leave them?

14    A.    His -- the company started going downhill, so I

15    didn't want to just, all of a sudden, not have a job,

16    so I went and looked for another one.

17    Q.    And what's the next job you went to?

18    A.    The car lot down there in Washburn Mountain.

19    Q.    What mountain?

20    A.    Washburn Mountain.

21    Q.    Where is that at?

22    A.    Right before Greenwood coming from Booneville.

23    Q.    And were you selling cars?

24    A.    I was selling cars and helping the gentleman

25    rebuild -- or remodel his house for him.
```

1   Q.   Who was that gentleman?

2   A.   John something.  I have -- oh, my God -- John

3   Frank.

4   Q.   What was the name of his car lot?

5   A.   Washburn Mountain Motors.

6   Q.   And were you an hourly employee, or how did you

7   get paid there?

8   A.   Yeah, I got paid hourly.

9   Q.   And so they -- they would pay you from -- your

10  paycheck would come from Washburn Mountain Motor

11  Company -- or Washburn Mountain Motors?

12  A.   Yeah.  Yeah.

13  Q.   Even if you were doing remodeling work for

14  Mr. Frank?

15  A.   Yeah.

16  Q.   He wouldn't pay you separately for that work.

17  A.   He paid me separately for his housework.  But, I

18  mean, the checks -- all of the checks that I got said

19  Washburn Mountain Motors on them.

20  Q.   About how long were you with Washburn Mountain

21  Motors?

22  A.   About three months.

23  Q.   That's not very long.

24  A.   No.

25  Q.   What happened?

1   A.   Because he got -- he got done remodeling his

2   house, and he was running out of cars.  And so that's

3   what I went to Westwind.

4   Q.   So that would have been the beginning of 2020, end

5   of 2019?

6   A.   Yeah.

7   Q.   And before we get into Westwind, Mr. Watson, did

8   you ever serve in the military?

9   A.   No, I did not.

10  Q.   You said you were helping Mr. Frank remodel his

11  house.  Do you have a contractor's license?

12  A.   No.

13  Q.   Do you have a remodeler's license?

14  A.   No, I do not.

15  Q.   Did Mr. Frank?

16  A.   He said he did.

17  Q.   Have you ever applied for a contractor's license?

18  A.   No, I have not.

19  Q.   All right.  So, after -- after Washburn Motors,

20  you said your next job was Westwind; is that correct?

21  A.   Yeah.

22  Q.   And tell me about how you found out about

23  Westwind?

24  A.   Through John Frank.

25  Q.   How did he know about it?

1   A.   Because he is friends with them.

2   Q.   So John told you that Westwind might be looking

3   for people to work there?

4   A.   Yes.

5   Q.   So did he put in a word with you, or did you go

6   out and meet them?  I mean, how did that introduction

7   take place?

8   A.   He called them, and said, "I have a guy here who

9   needs a job."

10       And they told him to have me come down there and

11  do an application and everything.

12  Q.   And, when you say "down there," I'm assuming that

13  is at Westwind's shop?

14  A.   Yeah.

15  Q.   And where -- where is that shop located at?

16  A.   Right down the road, like, literally a mile from

17  the car lot.

18  Q.   And about how far a drive would that be from where

19  you were living at the time?

20  A.   About 30 minutes.

21  Q.   Okay.  So, I'm assuming, Mr. Frank put in a call,

22  and then you had -- you had an appointment to go out

23  and meet the folks at Westwind; is that correct?

24  A.   Yeah.

25  Q.   And so you went out; had an interview, I am

1   assuming?

2   A.    Yeah.

3   Q.    Who did you interview with?

4   A.    Both of them.

5   Q.    When you say "both of them" --

6   A.    Mark and Noreen.  Mark and Noreen.

7   Q.    Did that interview take place in the shop?

8   A.    Yeah.

9   Q.    And did they offer you a job in that interview, or

10  did they call you back?  I mean, how did that take

11  place?

12  A.    Offered me a job at the interview -- after the

13  interview.  My bad.

14  Q.    During the interview did they explain the type of

15  work that you would be doing?

16  A.    Yeah.

17  Q.    And what did they -- what did they tell you you

18  would be doing?

19  A.    Just that I would be welding plastic on bins.

20  Q.    I'm, obviously, not a welder.  So enlighten me a

21  little bit on what welding plastic bins -- what all of

22  that entails?

23  A.    Ground the spot -- like, you have to smooth out

24  the spot that you are welding with a little grinder

25  tool.  And then heat it up with a -- with a torch.  And

1    then take your welding gun that you have for welding

2    plastic and run the rod through and then weld it.  And

3    then after you weld that spot, you have to let it cool

4    down, and then smooth it out and make it look new.

5    Q.    It sounds pretty technical, doesn't it?

6    A.    Yeah.

7    Q.    I'm sorry.  I didn't hear you, Shamus.

8    A.    Yeah.  It's pretty -- it's pretty crazy.  It's --

9    yeah.

10   Q.    So, I mean, I guess -- I guess, your prior welding

11   experience made it a little easier for you to do the

12   welding at Westwind?

13   A.    Yeah, kind of.  But it's a little different.

14   Q.    I mean, how is it different?  I'm clueless on

15   plastic-welding.

16   A.    Just the way you have to load your rods, and the

17   way you have to slowly work your way with the plastic

18   on it and everything.  The way you have got to get your

19   heat and stuff.

20   Q.    Is it kind of a specialized type of welding?

21   A.    Yeah.

22   Q.    And you said they said you can start working there

23   after the interview.

24         Did they give you a tour of the shop?

25   A.    Yeah.

1   Q.    Kind of explain to me how it is set up?

2   A.    You walk in the front door, and there's where --

3   and the front door is where you have all of the wash

4   bins that were washed and everything.  And then you

5   walk a little bit ways back, and then you have the two

6   tool aisles; that, if we needed any tools for anything,

7   we could come back there and use them.  And then a

8   little further back is where you have your welding --

9   your welding rooms, which is where you have the -- all

10  of your employees and stuff were -- were welding and

11  everything.

12  Q.    So, whenever you were welding out there, roughly

13  how many others -- how many other would be welding at

14  any one time?

15  A.    Twelve to 14.

16  Q.    And would you -- would each welder have, like, a

17  designated workspace, or how did that work?

18  A.    Yeah.

19  Q.    So, once you -- once you started working out

20  there -- like, for example, it would be, like, okay,

21  "This is Shamus Watson's workstation.  This is Mike

22  Smith's workstation"; is that kind of how it was set

23  up?

24  A.    Yep.

25  Q.    So with these bins would -- would they -- I mean,

1  where did they come from?

2  A.    Like, Butterball, Tyson, Pepper Source, damn big

3  companies like that.

4  Q.    And so -- you know, I'm just trying to wrap my

5  head around this.

6        So, I guess, they would send these bins out to the

7  shop for repair work?

8  A.    Yeah.

9  Q.    Would they bring them out there themselves, or

10  would Westwind go and get them?

11  A.    There's some bins at, like, Butterball --

12  Butterball, we -- we would have to go get them.

13        But, like -- I forget what the company of -- the

14  other one is.

15        But there is one company that would send them out

16  there to us.

17  Q.    And, you know, so, I guess, these companies would

18  send these bins out here.  And would it be, like, a

19  repair order, or -- I mean, how many -- how many bins

20  would they send?

21  A.    Anywhere from -- we'd have probably, I'm going to

22  say, 500 bins in the yard to repair.

23  Q.    So, it sounds like, you had plenty of work to do

24  at all times?

25  A.    Yeah.

1    Q.    And, so, the bins would be in the yard.  Would

2    they -- would they arrive at the shop, and you'd unload

3    them out of a truck, or -- I mean, flesh this out.

4    A.    Yeah.

5    Q.    Okay.

6    A.    They would arrive --

7    Q.    I'm sorry?

8    A.    They would arrive -- they would arrive at the

9    shop.  We'd unload them, and put them in the yard, and

10   wait to get repaired.

11   Q.    So, once they are unloaded, is there anything that

12   has to be done to them before you can start repairing

13   them and welding them?

14   A.    Wash them.

15   Q.    Would you hand wash them, pressure wash them, what

16   would that look like?

17   A.    Pressure wash them.  Like, we would soap them,

18   pressure wash them, and then send them in.

19   Q.    So, after they are pressure-washed, they would be

20   ready to be repaired?

21   A.    Yeah.

22   Q.    And, so, with these bins -- I mean, I think of an

23   -- I have an idea what a bin is.  But these companies

24   or sending these bins, I mean, how -- how big were

25   they?

1  A.  They were, probably, I'm going to say, 4x4 --

2  like, 4-foot by 4-foot, you know, wide.  And anywhere

3  from 3-foot to about 5-foot tall.

4  Q.  So the sizes on these bins would vary; it wasn't a

5  uniform size?

6  A.  Yeah.

7  Q.  And would some bins -- I'm assuming some bins

8  would need more repair work than others?

9  A.  Oh, yeah.

10  Q.  Some would probably be more damaged or scratched

11  or whatever -- whatever was done to them that would

12  need the repair work?

13  A.  Yeah.

14  Q.  So whenever -- I guess, whenever you started

15  working at Westwind, was it -- was it Noreen that gave

16  you the tour of the facility?

17  A.  No.  It was actually Mark that gave me the tour.

18  Q.  And whenever -- whenever you were given that tour,

19  did he -- did he show you how to operate the machinery

20  there, or what did that look like?

21  A.  Yeah.  He showed me how to weld and everything

22  with -- with the tools.

23  Q.  And did you have to display a certain level of

24  competency to be able to do that type of welding?

25  A.  No, he showed -- he showed me how to do it.  And

1    then told me to do it, I guess, to see if I was paying

2    attention.   And then I showed him that I could do it, a

3    little bit, and they hired me.

4    Q.    You had to -- I guess, he made you demonstrate a

5    weld before he hired you?

6    A.    Yep.

7    Q.    And did he make you sign any paperwork saying what

8    type of welding you would be doing or anything like

9    that?

10   A.    No.

11   Q.    And, I may have asked you this earlier, but -- you

12   said these bins, they -- some took longer than others

13   to weld; is that correct?

14   A.    Yeah.   Yeah.

15   Q.    And, I'm assuming, you know, somebody -- somebody

16   that walked in off the street and tried to do this,

17   they wouldn't be able to do this type of welding

18   without some training?

19   A.    No, they wouldn't be able to.

20   Q.    Is this type of welding a little bit more

21   specialized or technical than, you know, traditional

22   welding?

23   A.    I think it is.

24   Q.    Whenever you started providing services to

25   Westwind, did you have any type of welding

1  certification or anything like that?

2  A.   No, I did not.

3  Q.   You said, when you were hired, your job duties

4  were just to repair these plastic bins and welding; is

5  that correct?

6  A.   Yeah.

7  Q.   Do you recall after you started working with

8  Westwind -- or prior to working, signing an independent

9  contractor agreement?

10  A.   I do not remember.  I don't think so.

11            MR. HOOKS:  Sue, can we enter Exhibit 1

12         -- I think it's Exhibit 1.

13      (Wherein, an off-the-record conversation was

14               held.)

15      (Wherein, Deposition Exhibit 1 was marked.)

16            MR. HOOKS:  Sue, let's go ahead and mark

17         this as Exhibit 1.

18            THE COURT REPORTER:  Yes, sir.

19  BY MR. HOOKS:

20  Q.   Mr. Watson, what's marked as Exhibit 1 is entitled

21  Independent Contractor Agreement.  It's dated November

22  18th, 2020.  And it has your name on it.  Do you see

23  that?

24  A.   Yeah.  See, I didn't remember if I did or not,

25  like I said.  I didn't remember anything about an

1   Independent Contractor Agreement.

2   Q.    Well, and that's perfectly fine.  You know, I

3   can't remember what I had for lunch two days ago.

4   A.    Yeah.

5   Q.    That's human nature.

6   A.    Yeah.

7   Q.    But that is your signature on that document, isn't

8   it?

9   A.    Yes.

10  Q.    Okay.  And, if you will follow along with me, do

11  you see the fourth paragraph down it says, "This

12  agreement shall not render the contractor an employee,

13  partner agent of, or joint venturer with the company

14  for any purpose"; do you see that?

15  A.    Where at?

16  Q.    It is the second paragraph titled Independent

17  Contractor.  It's not the first one, but the second

18  one.

19  A.    Yeah.

20  Q.    Then on Page 2 looks -- there is a signature page.

21  It looks like you'd signed it, and Noreen Eccleston

22  signed this agreement on behalf of Westwind?

23  A.    Yeah.

24  Q.    You don't dispute that you signed an Independent

25  Contractor Agreement with Westwind?

1   A.   What was that?

2   Q.   You don't -- you don't dispute or deny signing

3   this agreement?

4   A.   Looks like my signature.

5   Q.   Okay.  And, so, this agreement that was signed

6   November 18th, 2020, would that have been roughly

7   around the time that you would have started working at

8   Westwind?

9   A.   Yeah.

10  Q.   So would you have signed this, you know, after

11  your initial interview with Westwind?

12  A.   Yeah.

13  Q.   Do you recall signing any other documents at

14  Westwind prior to you starting to provide your

15  services?

16  A.   I don't -- I mean, I don't remember.  Maybe.

17  Q.   Did Westwind give you an employee handbook

18  whenever you started?

19  A.   No.

20  Q.   Did they give you a policies and procedures manual

21  or anything like that?

22  A.   No.

23  Q.   How soon after that interview did you start

24  providing your services to Westwind?

25  A.   About a week and half.

1   Q.   A week and a half after your interview?

2   A.   Yeah.

3   Q.   And, when you -- when you started work, did you

4   report to the shop?

5   A.   What was that?

6   Q.   When you started providing your services for

7   Westwind, did you report to the shop -- the Westwind

8   shop?

9   A.   Yeah, to clock-in and stuff.

10   Q.   Now, when you say "clock-in" did you -- were you

11   actually punching a time clock?

12   A.   No.

13   Q.   Then -- then explain "clocking-in" to me?

14   A.   We would show up.

15   Q.   And what time would you show up at Westwind?

16   A.   Six -- yeah, 6:00 o'clock.

17   Q.   Whenever you started providing your services to

18   Westwind, did they tell you that -- or did they explain

19   the pay structure to you?

20   A.   Just told me that it would be hour -- hourly, and

21   that how much I would start making.

22   Q.   And this is whenever you were a plastic-welder for

23   Westwind?

24   A.   Yeah.

25   Q.   You weren't paid by how many bins you repaired?

```
 1   A.    No.

 2   Q.    So you are saying you were paid hourly?

 3   A.    Yep.

 4   Q.    What do you contend that your hourly rate was upon

 5   hire?

 6   A.    It was 14 an hour.

 7   Q.    Do you have any pay stubs from Westwind that say

 8   that, that your pay --

 9   A.    No, because they didn't give me no -- they didn't

10   give me no pay stubs.

11   Q.    Did they take taxes out of your paycheck?

12   A.    No, they did not.

13   Q.    Whenever you were hired by Westwind, did they give

14   you any type of employee benefits; like, a retirement

15   account or a 401(k) or anything like that?

16   A.    No, they did not.

17   Q.    Did they give you -- did they take -- did they

18   deduct out of your paycheck for disability insurance

19   or --

20   A.    No, they did not.

21   Q.    -- or pay -- other deductions for unemployment

22   taxes?

23   A.    Nope.

24   Q.    Social security, nothing?

25   A.    Nope.
```

1  Q.   So it is your position that you were just paid

2  straight hourly wage with no deductions?

3  A.   That's exactly how it was.

4  Q.   Is that how it was for the duration of your time

5  you spent working for Westwind?

6  A.   Yeah.

7          MR. HOOKS:  Go off the record for a

8      second.

9      (Wherein, an off-the-record conversation was

10          held.)

11 BY MR. HOOKS:

12 Q.   All right, Shamus, so before the break, we were

13 talking about your pay structure when you were working

14 at Westwind.

15      You said you were paid $14 an hour, and that

16 Westwind didn't take taxes out; was that your

17 testimony?

18 A.   Yes.

19 Q.   And you weren't paid by the bin at all, if you

20 repaired a bin?

21 A.   No.  No.

22 Q.   You didn't -- you never submitted invoices to

23 Westwind for bin repairs?

24 A.   The only invoice that I would bring in was that --

25 how many hours I worked, like, at the end of the week.

1  Q.    It wasn't for the amount of bins repaired?

2  A.    No.

3              MR. HOOKS:   Sue, can we screen share, I

4        think, Exhibit 3 [sic].

5     (Wherein, an off-the-record conversation was

6              held.)

7     (Wherein, Deposition Exhibit 2 was marked.)

8  BY MR. HOOKS:

9  Q.    Mr. Watson, what we have on our screen is a couple

10  of invoices that have your name on it from the time you

11  were at Westwind.

12        Are you able to see these, okay?

13  A.    Yes.

14  Q.    Okay.  And looks like there was -- I'm looking

15  from the left to the right.  First one I'm looking at

16  is dated March 5th, 2021.  It says, "Customer order."

17  It says, "Westwind"; do you see that?

18  A.    Yeah.

19  Q.    And then it says, "Shamus Watson," for name?

20  A.    Yes.

21  Q.    Okay.  Then do you see, it looks like it says

22  "bins welded, less rent" under the description; do you

23  see that?

24  A.    Yes.  And that is -- they still never paid us for

25  any of the bins that we welded.  The bins welded, they

1   wanted us to put that on there, because they wanted to

2   know how many bins that we welded that week.

3       And then the less rent was just basically us

4   paying -- paying for tools, even though we didn't pay

5   for any of the tools.

6   Q.   Okay.  So let's unpack this a little bit.

7       So, it looks like, on the far left, it says,

8   "Quantity."  It looks like -- and I'm looking at the

9   one dated March 5th.  It looks like it says "quantity

10  11"?

11  A.   Uh-huh.

12  Q.   So, I'm assuming, that would be the amount of bins

13  welded for that particular week is 11?

14  A.   Yep.

15  Q.   It looks like there is a price $68?

16  A.   Yeah.

17  Q.   And, then, less rent $35?

18  A.   Yep.

19  Q.   And then at the bottom it looks like, "Paid Shamus

20  Watson $640 on March 5th"; do you see that?

21  A.   Yes.

22  Q.   So that seems to -- seems to imply that you were

23  paid per bin; does it not?

24  A.   It seems like it, but I wasn't.  I was paid by

25  straight hourly wages.  They just told us to put them

1    on there.  They wanted to see how many bins that we

2    welded that week and everything.

3         And, the price thing, I didn't really understand

4    it.  But I just done it because they told me to do it.

5    Q.    So were you the one that was -- was filling out

6    these sheets of paper?

7    A.    Yes.

8    Q.    So you would -- let's call them invoices for

9    today's purposes.

10        So you would fill one of these out once a week,

11   I'm assuming?

12   A.    Yes.

13   Q.    And then you would give it to Westwind?

14   A.    I would give it to either Mark or Noreen.

15   Q.    And then they would cut you a check for that

16   amount at the bottom?

17   A.    Yeah.

18   Q.    They cut you a check for the amount that was at

19   the bottom of that invoice?

20   A.    Yeah.

21   Q.    So -- so, make sure I'm understanding correctly.

22        So, for instance, March 5th, 2021, for that week,

23   they would have cut you a check for $640?

24   A.    Yes.

25   Q.    And, so, is it fair for me to assume that, you

```
 1    know, going to the right, March 12, 2021 -- I can't
 2    hardly read that -- they would have paid you for the
 3    amount of bins welded on that date as well?
 4    A.   On that would be the week of the 12th that they
 5    would have paid me.
 6    Q.   Then, if we look at -- I'm assuming -- moving to
 7    the right on your screen, it looks like there is
 8    another invoice dated July 1 of 2022; do you see that?
 9    A.   Yeah.  And that -- and the 470 -- yeah, that's --
10    that's how many bins I washed, because I started
11    washing bins.
12    Q.   And -- and we'll get into the switch to the
13    washing.
14         But just for, you know -- just looking at this
15    invoice.  So it looks like you would have washed 90
16    bins the week of July 1st, 2022?
17    A.   Yes.
18    Q.   And total price for those bins was $470?
19    A.   Yeah.  But I don't remember writing it like that.
20         I never wrote the 470 and the 28 right there on
21    the price.  I wrote it right there on the amount, is
22    where I've always wrote it at.
23    Q.   Okay.
24    A.   Just like the one on the right of that, the one
25    that says 7/8/22, that's how I always wrote it.
```

1   Q.    The one on the right.   That's to the right of the

2   one dated seven -- 7/1; the one dated 7/8/22?

3   A.    Yeah -- yeah, the one dated 7/8, that's how I

4   always wrote it was right there on the right-hand side

5   in the amount.

6   Q.    Okay.   Okay.   So you -- on the July 8th, '22, it

7   looks like you would have received about $402 in

8   payment -- or $408?

9   A.    Yeah, because that's -- because I missed a couple

10  of days out of that week.

11  Q.    Okay.   So they would have cut you a check for that

12  400-and-change amount?

13  A.    Yes.

14        And see -- and I'm not trying to interrupt or

15  anything.   And if you noticed on the ones over on the

16  left-hand side, whenever I was welding them I -- it

17  would -- if I would have got -- if I would have got

18  paid for how many bins I done and everything, I would

19  have been getting paid 640 over here and

20  400-and-something over here.

21        So, over here, I washed 90 bins that week.   So, I

22  mean, to me, that seems like I would have been paid a

23  crap ton more than just 640 bucks or 402 -- or 442

24  bucks.

25  Q.    So you're thinking you should have been paid more

1    for when you were washing bins than what you were?

2    A.    No, no, no, no.   That's not what I'm saying.

3          I am saying, if I would have got paid by the bin,

4    I would have been paid a lot more, because I did 90

5    over here and then I done 11 and 6 over here.

6    Q.    And the washing, that's -- pressure washing the

7    bins, isn't it?

8    A.    Pressure washing with chemicals and everything,

9    yeah.   Like, the soap and everything has acid and all

10   of that stuff in it.

11   Q.    Okay.   That's not as difficult as welding, is it?

12   A.    No.

13         But, what I'm saying is, they paid me by the hour.

14   They straight told me that I was paid starting out 14

15   an hour.   By the time I left I was getting paid 17 an

16   hour.

17         They never ever once paid me by how many bins that

18   I done.

19   Q.    Mr. Watson, you test- -- earlier you said they cut

20   you a check for the amount that was on that invoice;

21   March 5th of $640?

22   A.    Yes, they did.

23   Q.    Okay --

24   A.    But I don't -- okay, so I don't know how to

25   explain it, but --

1    Okay, so the 675 on -- okay -- on the 5th of

2    March, the 675 is how much I made from hourly wages.

3    And then they -- they wanted us to put -- and I don't

4    understand why.  They wanted us to put how many bins

5    welded that we done that week, and then somehow add the

6    price in there, like, okay -- what was it; I'm trying

7    to think -- it was something, like, okay, so, like, I

8    done 11 bins that week.  And then, I guess, you divide

9    11 -- 11 to something, and then that's the price that

10   would come up right there on that, so that it showed

11   that, apparently, that or whatever -- I don't know how

12   to explain it.  It's weird.

13        But I just got told to write that down, because

14   they told me to write it down on my invoice.  But they

15   paid me hourly wages.

16   Q.   So you were the one --

17   A.   And this is the -- that's the only -- this is the

18   only -- do what?

19   Q.   You were the one that was filling out these

20   invoices and submitting them for payment?

21   A.   Yes.  Because they -- that's the only way we would

22   get paid.  And that is the only way that they wanted us

23   to write it down.

24   Q.   So it was your responsibility to track how many

25   bins you welded during any given week?

1  A.    Yeah.

2  Q.    And then to put that amount on the invoice.  Is

3  that a "yes"?

4  A.    Yeah, because that's the way they told us they

5  wanted to -- yes.

6  Q.    Because, if you weren't keeping track of any how

7  many bins were repaired, how would they know how many

8  bins were repaired, right?

9  A.    Yeah.

10 Q.    So, in theory, the more bins that you welded in

11 any given week, the more you were paid, right?

12 A.    No.

13 Q.    Why -- why do you -- why do you think that's the

14 case?

15 A.    Because it don't matter if I done 500 bins a week

16 or if I done 2 bins a week, I would have got paid the

17 same amount every week.  On my 40-hour week I would

18 have got paid the same amount.

19 Q.    Do you recall -- Mr. Watson, do you recall

20 answering some discovery requests in this lawsuit?

21 A.    What was that again?

22 Q.    Do you recall answering some interrogatories and

23 request for admissions in this lawsuit?

24 A.    I don't remember.

25 Q.    It was a set of written questions that your

1    counsel probably gave you or talked with you about?

2    A.    Oh, yes.  Yes.  Yes, I remember.

3    Q.    Okay.

4              MR. HOOKS:  Sue, I think it is number --

5         I actually don't think I sent these to you.

6         Let's go off the record.

7    (Wherein, an off-the-record conversation was

8         held.)

9              THE COURT REPORTER:  Back on the record.

10   BY MR. HOOKS:

11   Q.    Okay.  Mr. Watson, what's on the screen is your

12   responses to Defendants' First Set of Request for

13   Admissions; do these ring a bell to you at all?

14   A.    Yes.

15             MR. HOOKS:  Sue, can you scroll down to,

16        I think, Page 4?

17   BY MR. HOOKS:

18   Q.    Mr. Watson, Request Number 7 states: "Admit the

19   more bins/welds you performed, the more you would be

20   compensated"; do you see that?

21   A.    Yeah.

22   Q.    So it looks like you admitted defendants purported

23   to typically pay you by the bin; is that correct?

24   A.    Well, basically, what that was being said is that

25   -- and I tried -- and I was explaining that the more

1   bins that we got done and everything and they seen more

2   bins pushed out and everything, that they would give us

3   raises and stuff; like, basically, saying that if we

4   done better and if we done more bins and everything and

5   made them look cleaner and everything, that they would

6   give us more of an hourly wage; they would give us more

7   of a pay raise, is what that meant.

8   Q.   So it was kind of incentive-driven:  The more

9   bins, the better welds, the more that you would get

10  paid?

11  A.   Yeah.   The more pay -- like, they would give us a

12  pay raise.

13  Q.   So it was -- I guess, you know, when you were

14  doing the bin repair and the bin welding, it was:  The

15  more efficient you were on your welds, the more in

16  theory that you could be paid; is that fair to say?

17  A.   Yeah.

18  Q.   So the quicker -- the quicker the weld, the more

19  bins you could get to, the more you could put on your

20  invoice, the more you could in theory receive for

21  compensation?

22  A.   Well, we would still get the same pay.  But they

23  would give us a pay raise.  Like, they would give us

24  more an hour.

25  Q.   And that may have been a poor question on my part.

1   I ask poor questions a lot.

2       So, based on the amount of bins repaired, if you

3   -- the more you repaired in theory the more that you

4   could receive in compensation, correct?

5   A.   Yeah.

6   Q.   And that was as reflected on the invoices?

7   A.   I mean, yeah.

8   Q.   So, for example, if you did 10 -- 10 bins one

9   week, 20 bins the next week, you would get more --

10  there would be more compensation for the week that you

11  did 20 bins, at least on the invoice?

12  A.   No.  If I done 10 it would -- if I done 10 bins

13  one week and 20 bins the other week, as long as I

14  stayed there -- like, as long as I worked 40 hours a

15  week, I would get paid the same amount, because I was

16  getting paid hourly.

17  Q.   Okay.  But, what I'm -- what I'm asking is on the

18  invoice --

19  A.   They just -- they just -- they just made it look

20  like -- they just made it look like I was getting paid

21  so many bins.  Because, if you look on there, the

22  numbers changed to where how many bins to where the

23  price changed and everything on the bins.

24      Like, one week it would say $68 a bin.  The next

25  week it would say, like, $20 a bin.  They just wanted

1    it to, like, to where it would equal out what -- to our

2    -- to the paycheck.

3         But, if we done 20 bins one week, 10 bins one

4    week, 30 bins one week, as long as we worked 40 hours,

5    we would get paid the same exact amount.  The bin --

6    the price on the bins would change, because they wanted

7    it to look like the paycheck.

8    Q.   Okay.  Well, didn't you testify earlier that some

9    bins required more time to repair than others?

10   A.   Yes.  And they do.

11   Q.   Could that have been an explanation for why some

12   bins --

13   A.   Well, sometimes --

14   Q.   -- cost more than others or are invoiced at more

15   than others?

16   A.   No.  Because, I mean, some of the bins, it took

17   forever.  Some of the guys were really quick at it.

18   And some of our guys were really slow at it.  Like, you

19   could give one guy one bin that has a big old crack

20   down the side.  The next guy, the same bin, and it

21   would take one guy an hour.  The next guy it would take

22   him, like, three hours.  But we'd still get paid the

23   same exact every hour.

24   Q.   I'm assuming that's because, you know, some guys

25   are more skilled than others at the welding?

1   A.    Yeah.

2   Q.    So it's your position, Mr. Watson, that these

3   invoices that we have entered as Exhibit, I believe, 2,

4   those were not reflective of what you were paid in any

5   given week?

6   A.    No.  Those were just basically broke down like

7   they told us to write them down.  They told us to write

8   it like that.  And, if we didn't write them like we

9   [sic] wanted to, we wouldn't get paid.

10  Q.    But you would give these invoices to Westwind at

11  the end of every week?

12  A.    Yeah.  On Friday.

13  Q.    And Friday was payday?

14  A.    Yep.

15  Q.    And that was every Friday?

16  A.    Yeah.

17  Q.    So you mentioned that you were initially doing

18  some -- some welding on bins, and then you went to

19  doing the bin-washing; is that correct?

20  A.    Yeah.  Yeah.

21  Q.    Why did you switch?

22  A.    Because an older guy -- an older gentleman that

23  they had working there, he was outside in the heat and

24  everything, washing and everything.  And they wanted

25  him to be the maintenance guy, and they couldn't find

1    anybody to go outside and do the washing.  So I told

2    them that I would -- I would go outside and do the

3    washing.

4    Q.   And who was the -- or what was the name of that

5    older gentleman?

6    A.   Donnie something.

7    Q.   Do you recall, roughly, when you switched doing

8    the bin-washing instead of welding?

9    A.   I am going to say, I think, right at the end of --

10   right at the end of April, I think.

11   Q.   April of which year?

12   A.   2020.

13   Q.   Well, it looks like, you were -- per these

14   invoices --

15   A.   Wait.  Wait.  It was 2021, in April, it looks

16   like, I think.

17   Q.   So, as a bin-washer, did you get to the facility

18   at the same time as -- as the other contract workers?

19   A.   Yes.

20   Q.   Did you provide your own transportation to get to

21   the facility?

22   A.   Yes.

23   Q.   You drove your own truck, I'm assuming?

24   A.   Yes.

25   Q.   Didn't have a company truck?

```
 1   A.    No.

 2   Q.    So let's get into a typical day at Westwind.

 3         I believe you said the shop opened at 6:00?

 4   A.    Yeah.

 5   Q.    And how -- or what were the hours of operation?

 6   A.    Like, 6:00 to 2:30.

 7   Q.    I'm assuming you had a lunch in there at some

 8   point?

 9   A.    Yeah.

10   Q.    Thirty-minute lunch?

11   A.    Yep.

12   Q.    Restaurant you go to close to the facility, or

13   bring your own lunch; I mean, what did that look like?

14   A.    We brought our own lunch, because they wouldn't

15   let us leave.

16   Q.    Did they have a written policy saying you couldn't

17   leave?

18   A.    No.  They just told us that we, basically,

19   couldn't leave for lunch.

20   Q.    Was there a certain time you took lunch every day?

21   A.    Yep.  The first break, 10:00.  And then the second

22   set, 10:30.

23   Q.    Thirty minutes a piece?

24   A.    Yes.  Like, one set of people that went on lunches

25   would get 30 minutes a day.  And then the -- and then
```

1   they'd come back in, and the second set of people would

2   go out to lunch at 10:30 and then come back in, is what

3   I meant.  We didn't get two lunches.  We got one lunch,

4   but there was two sets.

5   Q.   Sure.  Sure.  So, leave lunch, go back to work;

6   and then you would work until 2:30?

7   A.   Yep.

8   Q.   And that was Monday through Friday?

9   A.   Yep.

10  Q.   So you didn't go in on Saturday or Sunday; is that

11  right?

12  A.   Every once in a while, when they would ask us.

13  Q.   And who would ask you?

14  A.   Mark.

15  Q.   So, whenever -- whenever 2:30 rolls around, would

16  they lock the shop up for the day?

17  A.   Yeah.

18  Q.   And would that be Mark that would do that?

19  A.   Yeah.

20  Q.   Did you have a key to the shop?

21  A.   No, I did not.

22  Q.   So whenever you were a plastic-welder; show up at

23  6:00 a.m., and would there just be bins sitting there

24  ready to be welded?

25  A.   Yeah.

1   Q.    And would you just go and grab a specific bin, or

2   what would that look like?

3   A.    Well, sometimes, if you didn't finish your bin

4   from the day before, you would finish it, and then go

5   on to the next bin that you grab.

6   Q.    You were free to choose which bin out of the stack

7   you would work on?

8   A.    Yep.

9   Q.    And, so, there was a designated portion of the

10  shop or the yard where -- they would say, "Okay.  These

11  are the bins that need to be repaired.  These are the

12  repaired bins"; is that -- were they separated?

13  A.    Yeah.

14  Q.    And, so, am I correct in my assumption that, you

15  know, you would go and walk to the bins that needed to

16  be repaired, grab one and take it to your specific

17  workstation?

18  A.    Yeah.

19  Q.    Then you would do your welding and your repair

20  work.  And, then, once you were done with it, you would

21  go in set it in the repair bin -- or the bins that had

22  been repaired, put it in that part of the shop?

23  A.    Yeah.

24  Q.    When you were doing your welding repair work, was

25  Mark there supervising you at all times?

1   A.    It was either Mark or Dylan.

2   Q.    What is Dylan's last name?

3   A.    Thacker.

4   Q.    What was his position with the company?

5   A.    He was the supervisor, boss, foreman, whatever you

6   want to call it.

7   Q.    So it wasn't Mark?

8   A.    Mark was the owner.

9   Q.    Mark wouldn't -- am I correct in saying that Mark

10  wouldn't be at the facility, you know, from 6:00 a.m.

11  to 2:30 every day?

12  A.    He'd be there.  But he wouldn't be inside the

13  whole time.

14  Q.    He wouldn't be in the shop?

15  A.    No.

16  Q.    Is there -- is there other buildings, you know,

17  besides the shop or -- or, you know, is it -- I mean,

18  describe the terrain for me?

19  A.    So when you pull up, you pull in the driveway,

20  there is a circle driveway that we parked in the middle

21  of.  And then the shop.  And then you pull down a

22  little past the shop, and it is their house.

23  Q.    Okay.  So Mark -- Mark would be out doing other

24  stuff around the property at some points during your

25  shift?

1   A.   I guess.  I never paid attention to what he was

2   doing.

3   Q.   So, when you -- when you got to work in the

4   mornings, you would -- you would just go and pick out

5   whatever bin that you thought needed to be done out of

6   the pile; is that right?

7   A.   Yeah.

8   Q.   You didn't have, like, a piece of paper or

9   something at your workspace saying, "This bin needs to

10  be done"; like, there was no order of work to be done,

11  was there?

12  A.   Every bin that was in the shop was the ones that

13  needed to be done.

14  Q.   But there wasn't, like, a specific, "You do this

15  3x5 bin first, and then do a 4x4 bin." It was just,

16  "Here's the bin pile; go get one and get it done"; is

17  that accurate?

18  A.   Yeah.

19  Q.   Was Noreen, was she ever around the shop during

20  the workday?

21  A.   Sometimes.

22  Q.   It was more her just coming in going?

23  A.   Yeah.

24  Q.   So, once a bin was completed, you put it in the

25  completed-bin pile, what would happen to those?

1   A.     They would get shipped out to the dock and put

2   onto the trailer --

3   Q.     That trailer --

4   A.     -- and be shipped out.

5   Q.     Are these bins, were they like --

6   A.     Sometimes -- sometimes it was a trailer for the

7   big companies' bins that they would come pick up.  Or

8   we would put them on the truck for one of, you know --

9   one of our bosses to take to where they needed to go.

10  Q.     And with that be Mark or Noreen that would haul

11  those loads?

12  A.     Yeah.

13  Q.     You never had to haul them, did you?

14  A.     No.

15  Q.     Were these bins, they were -- they had to meet --

16  they were USDA quality, weren't they?

17  A.     Yeah.

18  Q.     You know, without knowing the USDA regulations, it

19  would seem like these bins had to meet a certain

20  quality standard, I would assume?

21  A.     Yeah.

22  Q.     Were there any -- were there any specific company

23  policies or guidelines on performing these bin repairs,

24  or would you just grab one and do what needed to be

25  done however you saw fit?

1   A.    Just do it however we needed is all, because we

2   never saw anything about the guidelines.

3   Q.    You had the discretion to repair it however you

4   saw best to get it repaired?

5   A.    Yeah.

6   Q.    So, other than plastic-welding and the

7   bin-washing, was there any other thing -- any other

8   jobs you had at Westwind?

9   A.    No.

10  Q.    Do you recall any type of attendance policy being

11  in place when you were employed there?

12  A.    What do you mean?

13  Q.    Was there -- was there a policy in place at

14  Westwind whenever you were hired -- or whenever you

15  were providing contract services there saying, "You

16  know, if you are not here five days a week, you are

17  subject to termination"?

18  A.    I never -- I never got told that.

19              MR. HOOKS:  Sue, I -- when I asked that

20          question, I said when he was employed there.

21          I'd move -- I'd like to strike that

22          characterization.

23  BY MR. HOOKS:

24  Q.    So you never were given an attendance policy or

25  anything like that?

1    A.    No.

2    Q.    Were you given any -- any company policies after

3    you started providing contract services?

4    A.    I am going to say in, like, 2022 they were going

5    to start over in, like, giving us health insurance,

6    right at the end of me stop -- whenever I stopped

7    working.  And they said that we had to show up this

8    amount of days before we got put on their insurance.

9          Well, they had already knew about my health

10   problems.  And I had to go in and out of the doctors

11   all the time, and gave them doctors notes and

12   everything.  And they wouldn't put me on the -- their

13   insurance or any of that stuff, because I was gone all

14   the time going to the doctors.

15   Q.    So you missed a lot of work for doctors'

16   appointments and whatnot?

17   A.    Yes, figuring out my health problems.

18   Q.    And was those --

19   A.    Like, right at the end of me working there.

20         Do what?

21   Q.    Were those health problems in any way related to

22   your time -- you mentioned your previous health

23   problems a couple of years prior.  Was it in any way

24   related to that?

25   A.    No.

1    Q.    What -- what type of problems were you having?

2    A.    I was having chest problems, to where it would

3    hurt me bad enough to where my heart rate would shoot

4    up to 180 beats per minute.  And I would almost pass

5    out.  And it would feel like I was having a heart

6    attack.  And it would -- that would happen for about an

7    hour to two hours.  Ms. Noreen even took me to the

8    hospital one time for it, because it happened at work.

9    Q.    Did she take you to Mercy and Booneville?

10   A.    Yes.

11   Q.    Did you ever get an official diagnosis of

12   something related to your heart?

13   A.    They told me that it was just, like, something to

14   do with my stomach acid or some bull crap whatever.

15   And it was -- I don't know.  I'm just taking medicine

16   for it now, so...

17   Q.    What did they describe for you?

18   A.    You would ask me.  It starts with a P.

19   Q.    You are saying you got these heart problems, but

20   you don't even know what you are prescribed?

21   A.    No, no, no.  I didn't have heart problems.  I had

22   stomach problems that the acid would come up from my

23   stomach and go into my chest, to where it would cause

24   my heart to beat really fast, because it was hurting.

25   And I would send me into, like -- it was like I -- I

```
 1  was basically freaking out, and my chest was hurting at
 2  the same time.  I don't know how to explain it.  The
 3  doctor explained it to me.  But they prescribed me the
 4  medicine a long -- like, a while back.  I was taking
 5  it, but I quit taking it, because I don't have the
 6  insurance to get the medicine.  And, I mean, it ain't
 7  happening no more.  But I've been taking better care of
 8  myself and they -- I've had health physicians tell me
 9  ways that I can make it stop doing it, and healthier
10  ways to do stuff to where it ain't doing it no more.
11          So, instead of taking medicine and everything,
12  like I don't like doing, I have starting -- started
13  better health -- doing healthier things to make -- make
14  myself not do that no more.
15  Q.   Whenever you were having those problems,
16  Mr. Watson, were you smoking?
17  A.   Yeah.
18  Q.   How many packs -- or a pack a day?  I mean, how --
19  how frequently?
20  A.   A pack every two and a half, three days.
21  Q.   What about alcohol, were you consuming alcohol?
22  A.   No.
23  Q.   Never consumed alcohol when you worked at
24  Westwind?
25  A.   No.
```

1    Q.    I'm guessing, based on your testimony, your health

2    condition is better now?

3    A.    Yeah.

4    Q.    Getting back to Westwind.

5          So, as a -- as a bin-washer, you know, we looked

6    at your invoices.  It looks like, you know, at least on

7    paper, you were paid by the number of bins that were

8    washed.

9          Was there any -- or how long would it take to wash

10   any particular bin?

11   A.    One bin, it would probably take about -- flipping

12   it and everything, probably about 20 -- 20 minutes to

13   do one bin.  So I'm going to say -- because we washed

14   five bins every time we washed a round of bin.  So it

15   would be, probably, an hour or so to do a round of

16   bins -- to do five bins.  Just depends on how dirty

17   they were and everything.

18   Q.    And for your plastic-welding, roughly how long

19   would it take to do a weld?

20   A.    Just depends on how long it is and how deep it is

21   and how, you know, open the crack was.

22   Q.    I mean, are we talking an hour, 30 minutes?  Just

23   you don't have to give me exact exactions, just rough

24   estimate?

25   A.    To do -- to do one -- to do one weld every --

1    like, the whole procedure that you had to do to do a

2    weld, and to prep it and everything, it would take

3    anywhere from 10 to 30 minutes to, maybe sometimes, 45

4    minutes to do a weld.

5    Q.   If you missed a day or a shift at Westwind, would

6    somebody record that, or what would that look like?

7    A.   Yeah, Dylan would put it down on the calendar.

8    Q.   So there was a calendar at the shop that he would

9    write on --

10   A.   Yeah.

11   Q.   -- if you missed any particular day?

12   A.   Yeah.  Yeah.

13   Q.   Would he -- would that calendar show if somebody

14   showed up late or worked half a day or was not in the

15   shop?

16   A.   Yeah.

17   Q.   Were you -- did Westwind ever give you a written

18   schedule for when you were to work?

19   A.   No.

20   Q.   Were you ever punished by Westwind for missing a

21   workday?

22   A.   No.

23   Q.   They didn't give you, like, any type of written

24   reprimand or anything like that for missing some time?

25   A.   No.

1  Q.    When did -- when did you stop providing contract

2  services for Westwind?

3  A.    I'm going to say, maybe, the end of July to the

4  beginning of June of 2022.

5  Q.    And, after you -- after you ended at Westwind,

6  where did you go to work?

7  A.    I went to work on -- I went and done metal

8  buildings for, like, eight months.

9        And then now I'm working at Pruitt Drilling -- or

10 Pruitt Toilet and Supply in Fort Smith.

11 Q.    With metal buildings, were you -- I mean, who were

12 you working for doing it?

13 A.    Chris Becker, C&C Steel Construction.

14 Q.    Where are they based out of?

15 A.    Van Alma.

16 Q.    Van Alma?  Is that what you said?

17 A.    Yeah.  Van Alma.  Yeah.

18 Q.    Can you spell that?

19 A.    V-A-N-A-L-M-A.

20 Q.    Is that in Arkansas?

21 A.    Yeah.  It's right there next to Van Buren.

22 Q.    There's a town called Van Alma?  I know there's an

23 Alma.  I might be learning something new here.

24 A.    Yeah.  It's -- it's, like, a little bitty town

25 that is right in between Van Buren and Alma.

1  Q.   Heck.   I learned something new.   Can't say I've

2  ever been there.   I've been to Alma, and I've been to

3  Van Buren.

4       Okay.   So you were working there.

5       Would you -- so you would -- metal building

6  repair, I mean, tell me -- tell me about that.

7  A.   Oh, no.   I built metal buildings.

8  Q.   Oh, so y'all constructed metal building?

9  A.   Yeah, from ground up.

10  Q.   Were you paid by the hour for that?

11  A.   Yeah.   Yeah.

12  Q.   What was your hourly rate?

13  A.   Sixteen an hour.

14  Q.   For how big of a job -- how big a job did you all

15  do in terms of monetary value?

16  A.   We built anywhere from 40 to 80 -- 40x80 buildings

17  to 100 to -- 100 by -- or 100x200-foot buildings.

18  Q.   How much would it cost me to get one of those?

19  A.   A 40x80 would probably be about 80- to 100,000.

20  Q.   Did you get your contractor's license when you

21  were working at C&C Steel?

22  A.   No.

23  Q.   After -- after C&C Steel you started working for

24  Pruitt in Fort Smith.   Where is -- where is that --

25  A.   Yes.

1    Q.    -- business located in town?

2    A.    On Highway 45.

3    Q.    What was your title with Pruitt?

4    A.    My title now is, I'm a forklift operator.  But I

5    also clean drilling rig pipe and pipe -- just packs

6    away and get them ready to be shipped out.

7    Q.    Are you paid hourly in that job?

8    A.    Yeah.

9    Q.    What your hourly pay?

10   A.    Seventeen an hour right now.  But I'm fixing to

11   get moved up, I -- I think.

12   Q.    Well, I hope you do.  I hope you do.

13         So do you get any other benefits with that job?

14   A.    I get health insurance.  I get dental insurance.

15   I'm trying to think of what else.  I get life

16   insurance.  Just a couple more things.  I forget.  I

17   have to go and look, but all of my files and stuff for

18   work are at work.

19   Q.    Maybe get a 401(k)?

20   A.    Yeah.  That's another one.

21   Q.    So they take -- they deduct out of your paycheck,

22   and they put it into the 401(k); is that kind of how

23   you are set up?

24   A.    Yeah.

25   Q.    And you are still currently working there?

1   A.   Yes.

2   Q.   When you were providing your services to Westwind,

3   did they ever tell you you couldn't work anywhere else?

4   A.   Yes, they did.

5   Q.   Who -- who do you say -- who do you think told you

6   that?

7   A.   I know, for a fact, that Mark and Noreen told me.

8   Q.   Did they ever communicate that to you in writing?

9   A.   No.   I -- I had told them, if I had a chance to go

10  better my life, and if anything happened, would I be

11  able to come back here; and they said "no, you're not

12  allowed to go nowhere.   If you go somewhere else, then

13  don't ever expect to get a chance to come back here."

14  Q.   Well, that's not -- that's not what I asked.

15       I asked if, whenever you were providing your

16  services to Westwind, from roughly 6:00 a.m. to 2:30,

17  they never told you you couldn't go do something that

18  afternoon for somebody else, did they?

19  A.   Oh, I mean.   They said we -- they'd rather us not

20  go work somewhere else, because they don't want us

21  tired -- tired in the morning whenever we come to work.

22  Q.   But they never said you couldn't go work for

23  somebody else; is that correct?

24  A.   No.

25  Q.   So, in theory, you could have left Westwind at

1   2:30 and went and mowed a couple of yards or something

2   like that and made a little bit of extra money, is

3   that -- is that how I'm understanding?

4   A.   Yeah.

5   Q.   Is that a "yes"?

6   A.   Yeah.  Yeah.

7   Q.   Whenever you stopped providing your service --

8   services to Westwind, did you give them two weeks'

9   notice?

10  A.   No.

11  Q.   How did that -- how did that come to fruition, the

12  end of your time at Westwind.

13  A.   Because I told Ms. Noreen, I said -- I told her

14  that I have a chance to better my life and to have a

15  better job and everything.  And that I thanked them for

16  letting me come to work for them and giving me a

17  chance.  And I was super nice about it.  And I said

18  that -- you know, that this would be my last day,

19  because I'm going to work for somebody else for a

20  better job and everything.  And, like I said, I thanked

21  them for letting me work for them.

22  Q.   Was that better job, was that the C&C Steel?

23  A.   Yeah.

24  Q.   Do you recall what day of the week it was that you

25  told them you were leaving?

```
1    A.    I'm not sure.

2    Q.    Whenever -- whenever you told them that you were

3    leaving, did they cut you a check for that week, and

4    then you were done and on your way?

5    A.    No.

6    Q.    You were just done?  You just left?

7    A.    Yep.

8    Q.    How long have you known Darrell Buck?

9    A.    Since he started working at Westwind.

10   Q.    Was he a welder out there as well?

11   A.    Yeah, he was.

12   Q.    Did he convince you to stop working at Westwind?

13   A.    No.

14   Q.    All your decision?

15   A.    Yeah, it was every -- it was all my decision.

16   Q.    And you said it was for a better opportunity?

17   A.    Yes.

18   Q.    It didn't have anything to do with wages or

19   anything like that?

20   A.    Just a better opportunity.

21              MR. HOOKS:  Let's take five minutes.

22        (Wherein, a break was taken from 12:33 p.m. to

23              12:42 p.m.)

24   BY MR. HOOKS:

25   Q.    Mr. Watson, earlier today we were discussing your
```

1    pay.  And we discussed some invoices that showed --

2    amounts -- amounts of bins welded and the amount of

3    bins washed.  You've stated that you were paid hourly,

4    so I just want to, you know, dig a little bit more into

5    that.

6    A.    Okay.

7                MR. HOOKS:  So, Sue, let's do -- I sent

8           you some documents -- some checks from

9           Westwind.  If you could share the screen for

10          that.

11               THE COURT REPORTER:  Sure.  One minute.

12          (Wherein, an off-the-record conversation was

13                 held.)

14   BY MR. HOOKS:

15   Q.    Mr. Watson, can you see these invoices on the

16   screen?

17   A.    Yes.

18   Q.    Okay.  Thank you.

19         So, I'm going to work from left to right.  So on

20   the left side we have an invoice from you to Westwind

21   dated May 27, 2022.  Then there is another one dated

22   May 13th of 2022.  Can you see those clearly?

23   A.    Yeah.

24   Q.    And it looks like on the May 27th invoice after

25   the rent has been deducted it looks like there is a

1    payment amount of $484 on that invoice; do you see

2    that?

3    A.    Yeah.

4    Q.    Do you agree that it says 484 there?

5    A.    Yeah.

6    Q.    And then, it looks like, on the one directly to

7    the right dated May 13th, 2022 it looks like there is

8    an amount $680 after the rent has been deducted; do you

9    see that?

10   A.    Yes.

11   Q.    Do you agree that invoice says $680?

12   A.    Yes.

13   Q.    And then, moving to the right, there is an invoice

14   dated June 3rd, 2022?

15   A.    Yeah.

16   Q.    And it looks like there's $544 amount on that

17   invoice?

18   A.    Yep.

19   Q.    And then the last one on this page is dated June

20   10th, 2022; do you see that?

21   A.    Yes.

22   Q.    It looks like there's $289 at the bottom of that

23   listed?

24   A.    Yes.

25                   MR. HOOKS:   Sue, let's go ahead and mark

```
 1              this -- I lost count -- I think it's
 2              Exhibit 3, isn't it?
 3         (Wherein, an off-the-record conversation was
 4              held.)
 5              THE COURT REPORTER:  Did you want to
 6         introduce the RFA as Exhibit 3?
 7              MR. HOOKS:  Yes, this document is
 8         Exhibit 3.
 9         (Wherein, Deposition Exhibit 3 was marked.)
10              THE COURT REPORTER:  Okay.  Then let's
11         do this as Exhibit 4, then.  Invoices,
12         Exhibit 4?
13              MR. HOOKS:  Okay.
14         (Wherein, Deposition Exhibit 4 was marked.)
15    BY MR. HOOKS:
16    Q.   Mr. Watson, can you see the screen here?
17    A.   Yeah.
18    Q.   Okay.  If you will pay attention to the second
19    check dated 5/13 of 2022, it looks like it's payable to
20    the order of Shamus Watson for $680; do you see that?
21    A.   Yeah.
22    Q.   Do you recall receiving a check from Westwind for
23    that amount?
24    A.   Yeah.
25    Q.   So that's -- that's where I'm a little bit
```

1   befuddled.   You said you were paid hourly, yet this

2   $680 amount that matches what was on the invoice that I

3   just introduced dated May 13th of 2022, as well; can

4   you explain that to me?

5   A.   That's -- hold on.   Can y'all still hear me?

6   Q.   Loud and clear.

7   A.   Okay.   Give me just a second.

8        Yeah, that was a 40-hour work week.

9   Q.   So that $680 amount on this check matches what was

10  on that invoice; is that correct?

11  A.   Yeah.

12  Q.   Okay.

13  A.   Like I said, that's a -- that was a 40-hour work

14  week.

15  Q.   Okay.

16              MR. HOOKS:   Let's scroll down, Sue.

17  BY MR. HOOKS:

18  Q.   May 27, 2022; do you see that?

19  A.   Yep.

20  Q.   Do you see that check?

21  A.   Yes.

22  Q.   $484 payable to Shamus Watson; do you see that?

23  A.   Yep.   That's a week -- that's one of the weeks --

24       Hold on.   My phone just bleeped out.

25       Okay.   There it is.

1    Q.    That -- that matches what was on your invoice

2    dated May 27th of 2022, doesn't it?

3    A.    Yeah, that's one of the weeks that I missed to go

4    to the doctors and everything.  That was it, like, a

5    three day work week or something like that -- like,

6    three and a half or something.

7    Q.    But it matches what was on your invoice?

8    A.    Yeah.

9    Q.    And nowhere on your invoice does it say the amount

10   of hours you worked, does it?

11   A.    No, it don't.  But that's what I'm saying.

12   Q.    So it says --

13   A.    They wanted us --

14   Q.    -- it says quantity --

15   A.    -- to write it out like that.

16   Q.    So, again, it says quantity 116 -- 110 -- it's

17   hard to see that -- bins washed, and then there is an

18   amount:  512, right?

19   A.    I'm not seeing that over here.

20   Q.    That was on the -- that was on the invoice.  It's

21   hard to go back and forth.

22   A.    Okay.  Okay.

23   Q.    There's an amount after there is a quantity; is

24   that correct?

25   A.    What was that again?

1   Q.   Scratch that.  Scratch that.  We're looking at the

2   checks here.

3                MR. HOOKS:  Can you -- Sue, can you

4           scroll down or go to the -- I'm sorry.

5                THE COURT REPORTER:  Sure thing.

6       (Wherein, an off-the-record conversation was

7                held.)

8   BY MR. HOOKS:

9   Q.   Mr. Watson, can you see this?

10  A.   Yeah.

11  Q.   Okay.  So, do you see the first check dated June

12  3rd, 2022?

13  A.   Yeah.

14  Q.   Payable to a Shamus Watson $544?

15  A.   Yeah.  Yep.

16                MR. HOOKS:  Can you switch tabs?

17  BY MR. HOOKS:

18  Q.   Okay, if you'll look at the invoice on the right

19  side of this screen dated June 3rd, 2022; do you see

20  that, Mr. Watson?

21  A.   Yeah.

22  Q.   It says $544 -- or is payable $544, isn't it?

23  A.   Yeah.

24  Q.   So the invoice matches the check?

25  A.   Yeah.

```
 1                    MR. HOOKS:  Sue, will you go back to the
 2              other tab, June?
 3   BY MR. HOOKS:
 4   Q.   Okay, Mr. Watson.  Do you see the second check
 5   dated June 10, 2022?
 6   A.   Yeah.
 7   Q.   It says payable to a Shamus Watson, $284.00; do
 8   you see that?
 9   A.   Yep.
10                    MR. HOOKS:  Okay.  Will you switch tabs,
11              please?
12   BY MR. HOOKS:
13   Q.   If you will look at the invoice dated June 10th,
14   2022 from Shamus Watson to Westwind, it shows --
15   A.   Yeah.
16   Q.   -- the amount matches, doesn't it?
17   A.   It looks like it.
18   Q.   So that invoice matches the check?
19   A.   Yeah.
20                    MR. HOOKS:  Sue, I'd like to enter the
21              June check payments as an exhibit, please.
22                    THE COURT REPORTER:  Can we make the May
23              checks -- did you want to introduce the May
24              checks as well?
25                    MR. HOOKS:  Yes, I thought I already
```

1          had.  I'm sorry.  Yes.

2                  THE COURT REPORTER:  I'm sorry.  If you

3          did, I did not get it.

4                  Let's do May checks as Exhibit 5; June

5          checks as Exhibit 6.

6                  MR. HOOKS:  Yes, please.

7                  THE COURT REPORTER:  Is that good?

8          Okay.

9     (Wherein, Deposition Exhibit 5 was marked.)

10    (Wherein, Deposition Exhibit 6 was marked.)

11    (Wherein, an off-the-record conversation was

12              held.)

13                 MR. HOOKS:  Sue, have we entered -- I'm

14         sorry.  I've lost track via Zoom.  Have we

15         entered these invoices as exhibits already?

16                 THE COURT REPORTER:  Yes, we have.

17                 MR. HOOKS:  And we've got the checks

18         entered as well?

19                 THE COURT REPORTER:  Yes, we have.

20         Invoices -- I think that's May and June

21         invoices are Exhibit 4.  And May checks are

22         Exhibit 5.  And June checks are Exhibit 6;

23         does that work for everybody?

24                 MR. HOOKS:  Yes.

25                 THE COURT REPORTER:  Okay.

1                MR. HOOKS:  You can stop screen sharing.

2    BY MR. HOOKS:

3    Q.   So, Mr. Watson, based on the invoices and checks I

4    have shown you, would you agree that it looked like you

5    were paid per bin washed or per bin welded, based just

6    on the invoices and checks?

7    A.   Yeah.

8    Q.   And you don't dispute that that was your signature

9    on the invoices, do you?

10   A.   Yeah, it was.

11   Q.   And you don't dispute that those checks were made

12   payable from Westwind to you; is that correct?

13   A.   Yes.

14   Q.   Mr. Watson, have you filed taxes for the last

15   three years?

16   A.   Have I filed taxes?

17   Q.   Yes.  Or had somebody prepare a tax return for

18   you?

19   A.   I've had to pay in.

20   Q.   Do you -- do you know if you filed a tax return in

21   the last three years?

22   A.   I went to file.  But I had to pay in, because

23   1099s.

24   Q.   Did you -- did you go to an accountant or a CPA to

25   do that for you?

```
1    A.    I had H&R Block do it.

2    Q.    H&R Block has done your taxes for you the last

3    three years?

4    A.    Yeah.

5    Q.    Do you have copies of your tax returns --

6    A.    I do not.

7    Q.    -- from 20- --

8    A.    I have a -- I have to find them.  I have 1099s put

9    up somewhere.

10   Q.    Do you agree to produce those to me or to your

11   attorney in this lawsuit?

12   A.    Yeah.  I'll give them to my attorney.

13   Q.    Thank you.

14         And have you ever started a company or a business

15   of your own?

16   A.    No, I have not.

17   Q.    So, for all the entities and businesses you have

18   worked for or provide contract services for, you were

19   paid to Shamus Watson individually; is that correct?

20   A.    Yeah.  Yeah.

21   Q.    Have you ever been arrested?

22   A.    A long time ago.

23   Q.    Do you recall what for?

24   A.    I'd rather not say.

25   Q.    I don't want to incriminate you or anything.
```

1        Is it a felony, misdemeanor?

2   A.   It's just a misdemeanor.

3   Q.   Did that occur in Logan County?

4   A.   Yes.

5   Q.   Had any traffic tickets, speeding tickets,

6   anything like that, in the last 10 years?

7   A.   Yes.

8   Q.   Are those in Logan County as well?

9   A.   Yes.

10  Q.   When was the most recent?

11  A.   Six months ago, something like that.  Maybe a

12  little over.

13  Q.   Whenever you were providing your services to

14  Westwind, did they ever reimburse you for mileage?

15  A.   No, they did not.

16  Q.   Did they pay insurance premiums on your -- on your

17  vehicle?

18  A.   No, they did not.

19  Q.   Did they ever pay for any repairs on your truck or

20  your vehicle that you drove there?

21  A.   No, they did not.

22  Q.   When you were providing your services to Westwind,

23  did they have a business card made for you?

24  A.   I don't think they ever gave me one.

25  Q.   They give you a name badge?

1   A.   No, they did not.

2   Q.   Did -- whenever you worked at Westwind, did they

3   give you a uniform?

4   A.   Yeah, they did.

5   Q.   What type -- I mean, what type of clothes was it?

6   A.   It was just a button-up shirt and a set of jeans

7   from Cintas.

8   Q.   Did they let you pick -- pick out what kind of

9   shirt you wanted and type of jeans, or did they just do

10  it on their own?

11  A.   I got to pick whether I wanted jeans or khakis.

12  Q.   So, other welders may have been wearing something

13  different than you?

14  A.   Yeah.

15  Q.   So there wasn't -- all the welders weren't

16  required to wear the exact same uniform; is that a fair

17  statement?

18  A.   Yeah.

19  Q.   And did those uniforms, did they stay in the shop,

20  or did you wear those home?

21  A.   They stayed in the shop.

22  Q.   Would Westwind clean those uniforms, or did they

23  have somebody do it?

24  A.   They had somebody do it.

25  Q.   Do you recall who that was?

1    A.    Cintas.

2    Q.    And, so, whenever you arrived at Westwind, I

3    guess, you'd -- you'd be in your personal attire, and

4    then you would switch into those jeans --

5    A.    Yes.

6    Q.    -- and button-up shirt?

7    A.    Yes.

8    Q.    Roughly how long would that take to swap uniforms?

9    A.    Fifteen, 20 minutes.

10    Q.    Put on a pair of blue jeans?

11    A.    We didn't just have to do that, though.  We had to

12    sanitize and everything.

13    Q.    All right.  Tell me a little bit about that?

14    A.    Walk in the door, step in this little tub little

15    thing to sanitize your boots.  And then you sanitize

16    your hands and everything.  And then you would go find

17    your uniform, and then you'd go to the dressing room

18    and wait on everybody to get dressed and then wait your

19    turn and then go in and get dressed.

20    Q.    You would step in a tub, did this tub disperse

21    spray, or what was that like?

22    A.    No.  It had chemicals in it already whenever you

23    step in it.

24    Q.    So you step in; step out?

25    A.    Yeah.

1  Q.   That couldn't have taken long at all, could it?

2  A.   To wait on everybody and to get everything and to

3  sanitize fully and to wait on everybody and get dressed

4  and everything, about 15, 20 minutes.

5  Q.   Okay.

6  A.   Because we only had, like, three dressing rooms,

7  and we had 16 people.

8  Q.   But as far as the tub, that -- you just step in

9  and splash it on your boots, then you step right out;

10 is that correct?

11 A.   Yeah.

12 Q.   And, then, you said you sanitize your hands.  I

13 mean, would they have a dispenser there with Germ-X or

14 something?

15 A.   Yeah.

16 Q.   That would take, like, what, 30 seconds to

17 sanitize your hands, give or take?

18 A.   Yeah.

19 Q.   And did they have the sanitizing procedure in

20 place for your entire time you were providing your

21 services to Westwind?

22 A.   Yes.

23 Q.   They had it in place in 20- -- in late 2020?

24 A.   Yeah.

25 Q.   And that was during COVID, right?

1  A.   Yep.

2  Q.   But you -- you individually -- put on a -- put on

3  a shirt and blue jeans, yourself, that would take,

4  what, a minute, two minutes?

5  A.   Yeah.  Something like that.

6       But over there we had to wait on everybody and,

7  plus, find our uniforms in a little coat rack that

8  everybody had to find their uniforms at the same time.

9  And then we could go to the dressing rooms, which we

10 had to wait on everybody to get dressed and wait our

11 turn.  And then we would finally be able to get

12 undressed out of our street clothes, and then get

13 dressed into the uniforms; which, like I said, took

14 about 15, 20 minutes.

15 Q.   But just you, yourself, you know, just the act of

16 putting on a shirt and blue jeans, you said one to two

17 minutes; is that correct?

18 A.   Something like that.

19 Q.   Okay.

20 A.   Yeah.

21 Q.   Did Westwind -- did they ever give you a written

22 policy in regards to sanitizing prior to starting --

23 starting the workday?

24 A.   No, they just told us that we had to.

25 Q.   That was due to safety concerns, wasn't it?

1    A.    I'm guessing.

2    Q.    Because if somebody got COVID in -- in the shop,

3    that could lead to production delays; is that a fair

4    statement?

5    A.    Yeah.

6    Q.    Do you have a Facebook account, Mr. Watson?

7    A.    Yeah.

8    Q.    Have you ever made any posts about Westwind on

9    your Facebook page?

10   A.    No, I have not.

11   Q.    Any posts about Mark or Noreen Eccleston?

12   A.    No, I have not.

13   Q.    In this lawsuit, do you know what type of damages

14   you are seeking?

15   A.    What do you mean?

16   Q.    And that's -- and that's perfectly fine for you to

17   ask that.

18         Is there a certain amount -- certain dollar amount

19   you are seeking from Westwind to compensate you?

20   A.    My attorney is working on that.

21   Q.    So you are just leaving it up to him?  You haven't

22   put any thought in to it?

23   A.    No, I have not.

24   Q.    Are you claiming unpaid wages -- unpaid overtime

25   wages?

1   A.   My attorney is working on that.

2   Q.   But don't you have to give him information on the

3   amount of hours you worked, so he can make that

4   determination?

5   A.   Yes.  And I have.  And that's why he's working on

6   it.

7   Q.   So how many overtime hours have you -- do you

8   believe you worked that went uncompensated?

9   A.   I don't know.  That's -- we've been putting it

10  together and getting it added up.  So me and him have

11  been working on that.

12  Q.   Is he --

13  A.   Or, actually, he's been working on that.

14  Q.   For any particular work week, I mean, are you

15  seeking -- are you saying you worked 50 hours, 60

16  hours, 100 hours, 41 hours?  Any ballpark on it?

17  A.   Well, I paid -- my paid work hours were 40 hours.

18  That was my straight hours.

19  Q.   So you are saying you just got compensated for 40

20  hours of time, and that's it?

21  A.   Yeah.

22          MR. HOOKS:  Let's take a five-minute

23      break.  We're about done.

24      (Wherein, a break was taken from 1:17 p.m. to 1:23

25          p.m.)

1          MR. HOOKS:  Sue, can you share Mr.

2     Watson's responses to interrogatories.

3          (Wherein, an off-the-record conversation was

4               held.)

5     BY MR. HOOKS:

6     Q.   Mr. Watson, can you see the screen?

7     A.   Yeah.

8     Q.   This is your Answers and Responses to Defendants'

9     First Set of Interrogatories and Request for Production

10    of Documents.  Do you remember working with your

11    counsel to answer these?

12    A.   That's William Catlett's.  That's not mine.

13    Q.   Oh, you're right.  It says Shamus Watson's Answers

14    to Defendants' -- all right.

15         (Wherein, an off-the-record conversation was

16               held.)

17         (Wherein, Deposition Exhibit 7 was marked.)

18

19    BY MR. HOOKS:

20    Q.   All right.  Mr. Watson, just for the record, your

21    attorney and I, we've stipulated these were your

22    responses.  It's just Mr. Ford or somebody in their

23    office simply forgot to switch out Mr. Catlett's name

24    on that first paragraph.

25         But, you know, scrolling through this document

1    there is mention about your chest complications and you

2    speaking with Westwind principals about that.

3            So just -- we just wanted to get that on the

4    record for today.

5    A.    Okay.

6                    MR. HOOKS:   Sue, would you scroll to

7            Interrogatory, I think it's, Number 5?

8            (Wherein, an off-the-record conversation was

9                    held.)

10   BY MR. HOOKS:

11   Q.    All right.   Mr. Watson, do you see the screen

12   here?

13   A.    Yeah.

14   Q.    And, just so we're on the same page, do you see

15   where it says "Interrogatory Number 6"?

16   A.    Yeah.

17   Q.    Okay.   So I'm going to work my way up from that.

18           So this -- this was your answer to Interrogatory

19   Number 5, which is what we're going to discuss.

20           That states -- your response is, "In a typical

21   workweek, I worked from Monday through Friday from

22   6:00 a.m. to 2:30 p.m."; do you see where you put that?

23   A.    Yeah.

24   Q.    Is that a "yes"?

25   A.    Yeah.

1  Q.   And you mentioned earlier that you had a 30-minute

2  period for lunch; wasn't that your testimony?

3  A.   Yes.

4  Q.   So, you know, I'm no mathematician.  But that

5  would come out to be -- with that lunch break, that

6  would come out to be 40 hours a week that you worked,

7  based on your response, wouldn't it?

8  A.   Wait.  Say that again.

9  Q.   So, Monday through Friday, you said, you worked

10  6:00 a.m. to 2:30 p.m.?

11  A.   Yes.

12  Q.   And you had a 30-minute lunch period in that time,

13  so that would leave eight hours?

14  A.   Yeah.

15  Q.   That would leave eight hours a day?

16  A.   Yeah.

17  Q.   And eight hours a day, times five days a week;

18  that's 40 hours, isn't it?

19  A.   Yeah.

20  Q.   So, if you worked 40 hours a week, how are you

21  claiming overtime?

22  A.   Because I've -- I've actually worked past the

23  eight hours a day doing sanitizing the -- sanitizing

24  the equipment and everything.

25  Q.   Do you have any documentation showing you worked

1   more than eight hours a day?

2   A.   No, I do not.

3   Q.   If you find documentation showing that, do you

4   agree to provide it to us for purposes of this lawsuit?

5   A.   It would take me a while, because I've got it all

6   put up and everything.

7   Q.   Well, it's -- you know, that -- those documents

8   are important to this litigation.  And you need to

9   produce those to your attorney so we can move forward

10  on this.

11       Are you claiming -- are you claiming any other

12  damages or seeking any other monetary awards from

13  Westwind, other than when we have discussed today?

14  A.   No.

15            MR. HOOKS:  Pass the witness.

16        EXAMINATION BY COUNSEL FOR PLAINTIFF

17  BY MR. FORD:

18  Q.   Mr. Watson, I just have a couple of questions for

19  you.  Apologies if my sound is weird.  There is a crazy

20  storm happening down here in Little Rock right now.

21       When you began working for Westwind, was it for a

22  set period of time, or was it indefinite or open-ended?

23  A.   It was indefinite.

24  Q.   Did you intend on working there for, you know, an

25  indefinite period of time; or did you have, in your own

1   mind, a set period of time that you wanted to work

2   there?

3   A.   I planned on working there indefinite.

4   Q.   Did you have any other job or -- or form of income

5   during the time that you worked for Westwind?

6   A.   No, I did not.

7   Q.   Have you ever held yourself out to be a welding

8   contractor of any kind?

9   A.   I didn't hold myself out to be.

10  Q.   Have you ever --

11  A.   I didn't think I was -- I was just...

12  Q.   I'm sorry.  I cut you off.  Please continue.

13  A.   I just went there to do my job and go home.

14  Q.   Have you ever advertised your ability to weld or

15  clean bins?

16  A.   No, I did not.

17  Q.   Have you ever performed these job functions for

18  any other employer?

19  A.   No.

20  Q.   If you were late to a shift -- you know, you say

21  that your regular time started at 6:00 a.m.; is that

22  correct?

23  A.   Yes.

24  Q.   If you showed up later than 6:00 a.m., did anyone

25  take note of that?

1    A.    Yes, they did.

2    Q.    Was your pay reduced accordingly?

3    A.    By "reduced," you mean?

4    Q.    If you showed up at 7:00 instead of 6:00, were you

5    paid less for showing up at 7:00, or were you paid the

6    same amount as if you had showed up at 6:00?

7    A.    I was paid the same amount every -- for my hourly

8    wages is, if I showed up late.

9    Q.    You were paid -- were you paid the same rate or

10   the same amount?

11   A.    Same rate.

12   Q.    Were you paid for that hour, even if you weren't

13   there for it?

14   A.    No, I was not.

15   Q.    Okay.  I don't think I'm going to get back into

16   those invoices.  So I'm going to skip over those

17   questions.

18          MR. HOOKS:  Sue, you can stop -- I'm

19          done with this interrogatory.  I don't know

20          if Daniel wants to get off it or not.

21          MR. FORD:  I appreciate it.

22   BY MR. FORD:

23   Q.    Was all the work that you performed for Westwind

24   performed at their facility?

25   A.    Yes.

1   Q.   Did you ever have to travel to any other sites or

2   anything like that for your job with Westwind?

3   A.   No.

4   Q.   Did you ever use the truck that you have been

5   discussing, did you ever use that vehicle for your work

6   with west end -- Westwind, other than to get to and

7   from work?

8   A.   No.  No.

9   Q.   When you were at the job site, and you were

10  performing your duties, what equipment were you using?

11  A.   I was using their power washer, their forklift,

12  and their welding equipment.

13  Q.   Did you bring any welding equipment with you to

14  work?

15  A.   No.

16  Q.   Did you use bring a power washer to work and use

17  that at the facility?

18  A.   No.

19  Q.   You mentioned the uniform a while a back that was

20  a pair of pants that you could decide between two

21  different types and then a button-down shirt; do I have

22  that correct?

23  A.   Yes.

24  Q.   If you wanted to perform the welding in a T-shirt

25  and shorts, could you do that?

```
 1   A.    I mean, I -- no.

 2   Q.    Why not?

 3   A.    Because they wanted us to wear their uniforms.

 4   Q.    Okay.  Did the uniform have any Westwind insignia

 5   or anything on it?  Did it have their name on the

 6   shirts or anything like that?

 7   A.    No.

 8   Q.    Okay.  But I am correct in saying you left the

 9   uniform there, and they did the laundry on it; is that

10   correct?

11   A.    Yes.

12   Q.    You mentioned a sanitation process that you

13   started your day with.  And you estimated that to be 15

14   to 20 minutes each day; is that correct?

15   A.    Yes.

16   Q.    What -- did that happen after 6:00 a.m. or before

17   6:00 a.m.?

18   A.    It happened after.

19   Q.    Okay.  Were you paid for that time?

20   A.    I don't feel like I was.

21   Q.    Why?

22   A.    Because they -- whenever we got everything --

23   whenever we would walk in the door, I would watch

24   people that were actually on the time clock that they

25   would actually -- like, they would punch their time.
```

1    They would get dressed and everything; and then, after

2    they got dressed, they would walk to the timeclock and

3    then they would punch their time.

4    Q.    Did you punch your time into a time clock?

5    A.    No, I did not.

6    Q.    Okay.  So these were some other employees that

7    were in a different position than you?

8    A.    Yeah.

9    Q.    Okay.  How -- how did the defendant know how many

10   hours a week to pay you for?

11   A.    Because I would -- whenever I would go -- like, I

12   would show up for work and leave work.  And then, at

13   the end of the day -- at the end of the week, I would

14   add up my time -- like, how many hours I worked that

15   week, and then I would multiply it by how many hours I

16   was making a week.  And I would hand them the invoice.

17   Q.    So, on those invoices -- and I may have Sue pull

18   these up in a minute -- but on those invoices the

19   number you are putting down as the price, is that --

20   are you saying that that is the number of hours you

21   worked that week times your hourly rate?

22   A.    No.  On the price that is -- and I get why he is

23   saying it looks like per bin -- that I'm getting paid

24   by per bin -- is because, on the left side of the

25   invoice, it shows how many bins I have done that week.

1  And then on the right side it shows, like, a number.

2  But that number is -- if you take that number and

3  divide it by -- or how would you do it?

4      If you take the dollar at the top -- like, the

5  first number at the top of the amount, and then you

6  would divide that by, I think, the quantity of how many

7  bins, you would get that number that is in the middle,

8  like, the price.

9  Q.   Okay.

10  A.   And that's what they wanted us to put down.

11  Q.   Okay.  You mentioned that you also sanitized the

12  machines, and that that sometimes occurred after 2:30;

13  is that correct?

14  A.   Yes.

15  Q.   And you did not include that time -- did you or

16  did you not include that time when you were talking

17  about getting paid for the hours that you worked in a

18  week?

19  A.   No.

20  Q.   And why not?

21  A.   Because they told me not to.

22  Q.   Okay.  Were you able to put down that you worked

23  more than 40 hours in a given week?

24  A.   We were able to.  But the checks that they would

25  give us would be for the 40 hours.

1    Q.    Are you saying that, even if you reported that you

2    worked more than 40 hours in a week, you would still

3    only be paid for 40 hours?

4    A.    We would -- we would be paid for 40 hours, and

5    then they would try to give us another check for

6    another straight time; and they would, like, split

7    it -- I don't know how they done it.

8         But they didn't -- they didn't pay us time and a

9    half, like they were supposed to.

10   Q.    Okay.  So, tell me if I'm wrong, but what I'm

11   hearing is you say they may give you another check

12   separate from your one big weekly paycheck for the

13   hours above 40, but it would be just at your regularly

14   hourly rate and not at a time-and-a-half rate; is that

15   correct?

16   A.    Yes.  Yes.

17   Q.    Okay.  If you had to estimate on a weekly basis

18   how many hours you spent on the sanitizing part that

19   they told you not to count for your hours, how much

20   would you say that was?

21   A.    A week?  Probably about four or five.

22             MR. FORD:  Okay.  I think that's all the

23        questions that I have.  I will pass the

24        witness back.

25

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | EXAMINATION BY COUNSEL FOR DEFENDANT                         |
| 2   | BY MR. HOOKS:                                                |
| 3   | Q.   Just a few follow-up, Mr. Watson.                       |
| 4   | So, I believe you testified that you started                |
| 5   | welding for Mr. Pettway circa 2014; is that -- is that      |
| 6   | correct?                                                     |
| 7   | A.   Yes, I -- yes.                                          |
| 8   | Q.   So whenever you would have started providing your      |
| 9   | welding services to Westwind, you would have had            |
| 10  | roughly six years of experience as a welder?                |
| 11  | A.   For regular welding; not plastic-welding.              |
| 12  | Q.   So plastic-welding is a specialized type of            |
| 13  | welding?                                                     |
| 14  | A.   It's a different kind of welding.                      |
| 15  | Q.   Okay.  To your knowledge, are there any other          |
| 16  | companies in the area that do the same work that            |
| 17  | Westwind does?                                              |
| 18  | A.   I have no idea, honestly.                              |
| 19  | Q.   So, none to your knowledge?                            |
| 20  | A.   Not to my knowledge, no.                               |
| 21  | Q.   You mentioned you used a forklift.                     |
| 22  | Are you -- are you certified to use a forklift?             |
| 23  | A.   Not through them, I was not.                           |
| 24  | Q.   Did you have your own forklift certification?          |
| 25  | A.   I do now, through my job that I have now.              |

```
 1    Q.    Whenever you were providing your services to
 2    Westwind, did you have your own welding tools at your
 3    own personal residence?
 4    A.    No.
 5    Q.    None whatsoever?
 6    A.    No.
 7    Q.    And you stated, whenever Mr. Ford was questioning
 8    you, that there was people that punched a timeclock,
 9    but you didn't; is that correct?
10    A.    Yes.
11    Q.    Can you give me the names of any individuals that
12    you believe punched a timeclock?
13    A.    Chester Sanders, Tim something -- oh, my God --
14    Q.    Tim Thomas?
15    A.    Franklin Gibson.  Huh?
16    Q.    Was it Tim Thomas?
17    A.    That might have been his name.
18          Cody Bolton [ph], Dylan Thacker, Donnie -- and I
19    forget his name -- his last name.  And I can't remember
20    the others' names.
21                MR. HOOKS:  I think that's all I've got.
22          I appreciate your time today.
23                THE WITNESS:  All right.  Thank y'all.
24                MR. FORD:  Thank you, Mr. Watson.  Have
25          a good rest of your day.
```

1                    THE WITNESS:  You too.

2          (Wherein, deposition concluded at 1:50 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### C E R T I F I C A T E

STATE OF ARKANSAS          )
                          )  SS
COUNTY OF SEBASTIAN        )

      I, Susan K. Wilcox, Certified Court Reporter for the State of Arkansas, do hereby certify as follows:

      (1) that on July 3, 2023, the witness, SHAMUS WALTER WATSON, was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein; (2) that the foregoing pages contain and are a true and correct transcription of the proceedings as reported verbatim by me via Stenomask to the best of my ability and transcribed and reduced to typewriting by myself or under my direction and supervision, and subject to appropriate changes submitted by witness, if any, during his/her requested reading and signing of this deposition according to the Federal Rules of Civil Procedure; (3) that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and that I am not a relative or employee of any attorney employed by the parties hereto; (4) that I am not financially or otherwise interested in the outcome of this action that affects or has substantial tendency to affect impartiality or requires me to relinquish control of an original or copies of a deposition transcript before it is certified, or that requires me to provide any service not made available to all parties to the action; and (5) that I have no contract with the parties, attorneys, or persons with an interest in the action; and that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter. This transcript is prepared at request of DEFENDANTS; and all fees are billed directly to DEFENDANTS in compliance with Arkansas Board of Court Reporter Examiners Regulations Section 19.

      Witness my hand and seal this 19th of July, 2023.

SUSAN K. WILCOX
Certified Reporter #629
19 Stoppel Road, Eureka Springs, AR 72632

SUSAN K. WILCOX
Arkansas Certified Court Reporter
CCR LS #629