IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DARRELL BUCK, SHAMUS WATSON, and
WILLIAM CATLETT, Each Individually and
on Behalf of All Others Similarly Situated    PLAINTIFFS

v.        CASE NO. 2:22-CV-2153-PKH

WESTWIND AND ASSOCIATES, INC.
and MARK ECCLESTON                                  DEFENDANT

DEPOSITION OF DARRELL EDWARD BUCK

          Taken by videoconference, on July 5, 2023, at
11:05 a.m.

          A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:
MR. DANIEL FORD
SANFORD LAW FIRM, PLLC
Kirkpatrick Plaza
10800 Financial Center Parkway, Suite 510
Little Rock, Arkansas 72211
daniel@sanfordlawfirm.com

ON BEHALF OF THE DEFENDANTS:
MR. CHRISTOPHER HOOKS
ROBERTSON, BEASLEY, SHIPLEY & ROBINSON, PLLC
315 North Seventh Street
Fort Smith, Arkansas 72901
chooks@rbsr-attorneys.com

*Wilcox* Court Reporting

*Realtime-Certified Court Reporting and Captioning*
(479) 253-1875 - wilcoxcourtreporting@gmail.com
www.wilcoxcourtreporting.net



EXHIBIT
6

**I N D E X**

                                                    PAGE

APPEARANCES  .......................................2

EXHIBITS  ..........................................2

CERTIFICATE  ......................................78

TESTIMONY OF DARRELL EDWARD BUCK

Examination by Mr. Hooks ..........................3

**E X H I B I T S**

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Independent Contractor Agreement | 33 |
| 2 | Sentencing Order | 65 |
| 3 | U.S. Department of Labor Letter Dated January 11, 2023 | 76 |

Reporter's notes:

1.  Quoted material is as read and not verified.
2.  Phonetic spellings are signified by [ph].
3.  Exactly as stated are signified by [sic].
4.  Interruptions and over-speaking are signified by dashes (--).
5.  Audio malfunctions in videoconferenced depositions can be caused by technical difficulties or over-speaking.
6.  Transcripts are not allowed to be provided to another party without express written consent of the reporter.

```
 1                S T I P U L A T I O N S
 2              The deposition of DARRELL EDWARD BUCK, in the
 3     above-styled cause was taken before Susan Wilcox, CCR,
 4     a Supreme Court-certified court reporter within and for
 5     Sebastian County, Arkansas, by videoconference, on July
 6     5, 2023, at 11:05 a.m., pursuant to Arkansas Rules of
 7     Civil Procedure.
 8                  P R O C E E D I N G S
 9                  DARRELL EDWARD BUCK
10              Having been called for examination by counsel
11     for the DEFENDANT, and having been first duly sworn,
12     was examined and testified as follows.
13              EXAMINATION BY COUNSEL FOR DEFENDANT
14     BY MR. HOOKS:
15     Q.   Good morning, Mr. Buck.  My name is Christopher
16     Hooks.  And I represent Westwind and Associates.  We
17     are here today for your deposition.  Before I get too
18     far into it, I just want to go over a few ground rules
19     today.
20          Let me just begin by asking:  Is this your first
21     time you've given a deposition before?
22     A.   I believe so, to my recollection.
23     Q.   Okay.  So, our court reporter today, she's going
24     to be taking down everything that is said, so it will
25     be important to get a clean record.  So, if you would,
```

1   whenever I ask you a question, if you would verbalize

2   your responses.  You know, a head nod is not

3   sufficient, so we need a clear clean record, so we need

4   to verbalize our responses; is that understood?

5   A.   Yes, sir.

6   Q.   I appreciate it.  And, you know, if there is a

7   question that is a bad question or, you know -- I ask

8   bad questions sometimes.  If it doesn't make sense to

9   you, just ask me to repeat the question, and I will be

10  happy to do so.

11  A.   Okay.

12  Q.   And, if you need to take a break at any time, to

13  get up and use the restroom, smoke break, whatever the

14  case may be, feel free to let me know.  All I ask is

15  that you answer the question that is immediately

16  presented before we take a break; is that okay with you

17  today?

18  A.   Yes, sir.

19  Q.   Would you please state your full name for the

20  record?

21  A.   Darrell Edward Buck.

22  Q.   What is your date of birth, Darrell?

23  A.   November 15th, 1980.

24  Q.   And what is your current address?

25  A.   It is 1613 Simeonof Street, Kodiak, Alaska 99615.

1  Q.   Can you spell -- can you spell the street for me?

2  A.   S-I-M-E-O-N-O-F.

3  Q.   I got a say, I'm a little bit jealous of you being

4  up in Alaska versus me being down here in this Arkansas

5  heat.

6  A.   It's amazing.

7  Q.   What's the temperature there this morning?

8  A.   Oh, it's high forties, low fifties.  Yeah.

9  Q.   It was 94 degrees here yesterday in Fort Smith.

10  A.   I don't miss it.

11  Q.   And are you currently married?

12  A.   Yes, sir.

13  Q.   What's your wife's name?

14  A.   Hollie Buck.

15  Q.   Polly?

16  A.   Hollie.

17  Q.   With a P?

18  A.   H-O-L-L-I-E.

19  Q.   And does she reside with you there in Kodiak?

20  A.   Yes, sir.

21  Q.   Do you have any children?

22  A.   We have one together.

23  Q.   How old are they?

24  A.   She is seven.

25  Q.   That's a fun age, isn't it?

1    A.    Oh, yeah.

2    Q.    How long have you lived in Alaska?

3    A.    Ten months.  Basically, I lost my job there at

4    Westwind -- was let go and -- and decided to up and go

5    to Alaska for better pay, better opportunity.

6    Q.    What are you currently doing in Alaska?

7    A.    I am a carpenter and taxidermist.

8    Q.    That's pretty good business up in Alaska?

9    A.    It is, both of them.

10   Q.    So what is the -- what is the most unique mount

11   you have done in your taxidermy business?

12   A.    A walrus.

13   Q.    A walrus?

14   A.    Yeah.  That was neat.

15   Q.    You probably don't get too many of those requests,

16   do you?

17   A.    It's hit and miss.  It's -- they've got to find

18   them dead on the beaches and bring them to me.  Not

19   allowed to hunt them.

20   Q.    Okay.  So that was my next question:  It's illegal

21   to hunt them in Alaska?

22   A.    Oh, yeah.  No walrus hunting.

23   Q.    What about moose?

24   A.    I've got a moose rack here.  I haven't done one

25   yet.  I've done a elk, bear, lots of others.

Susan Wilcox, AR-CCR #629, MO-CCR #1082, NVRA CVR/RVR #66391661

7

1   Q.   So, do you have a shop on your property there in

2   Alaska?

3   A.   No.  No, I've got a business license, and I run it

4   out of my home.

5   Q.   Did you buy your home up in Alaska, or are you

6   renting?

7   A.   I'm renting at the moment.

8   Q.   I bet rent is higher in Alaska than Arkansas,

9   isn't it?

10  A.   It's -- it's similar to California, which is where

11  I grew up and kind of used to.  Not a whole lot

12  different.  Some things are a little higher; but, for

13  the most part, it is pretty similar to California

14  prices.

15  Q.   So you were born in California?

16  A.   Yes, sir.

17  Q.   Where about?

18  A.   Anaheim.

19  Q.   Are you an Angels fan?

20  A.   Oh, yeah.  Whole life.

21  Q.   They had a rough week.  See where Trout went on

22  the DL?

23  A.   No, I have not been following any of it lately.

24  Q.   He had a broken wrist last week.

25  A.   Oh, really.

1   Q.   He did.

2   A.   Oh, man.

3   Q.   I think Ohtani is hurt, too.

4   A.   Oh, no.

5   Q.   Any other sports team in California that you

6   follow?

7   A.   I've been a Rams fan my whole life, Angels fan.

8   Q.   So when did you -- or did you move from California

9   to Arkansas -- or when did you do that?

10   A.   I did -- in 2018.

11   Q.   And why did you move to Arkansas?

12   A.   We -- we were just tired of the California life;

13   the rat race, you know, it was just too much.  We

14   didn't want to bring our kids up there.

15   Q.   They got some crazy policies out there, don't

16   they?

17   A.   Take them out to the country, which -- my

18   grandfather was from Arkansas.  And I used to go visit

19   him when I was a kid and just fell in love.  I always

20   wanted to move back.  And we gave it a shot back in

21   2018.  Lasted there about four years.

22        And, basically, it was when I was -- I lost my job

23   there at Westwind, that's when we decided to just head

24   on out and try something else.

25   Q.   So, when you moved to Arkansas, where did you

```
 1   live?
 2   A.    In Alma.
 3   Q.    Do you recall the address?
 4   A.    I don't recall it, no.
 5   Q.    Did you live in Alma your -- the entire time you
 6   were in Arkansas?
 7   A.    No.  No, we rented there for a short time.  And
 8   then we bought some property out in Booneville.
 9   Q.    Were you living -- when you were working for
10   Westwind were you living in Booneville?
11   A.    Yes, sir.
12   Q.    What was your address in Booneville?
13   A.    1878 County Line Road.
14   Q.    Is that -- Booneville is Logan County, isn't it?
15   A.    Yes, sir.
16   Q.    Were there any other places in Arkansas you lived
17   prior to moving to Alaska?
18   A.    No.  No, sir.
19   Q.    Tell me a little bit about your education --
20   educational history, Mr. Buck?
21   A.    I graduated high school; went into -- right into
22   the military, the Navy.  After the Navy I did a little
23   bit of community college.  And, basically, that was
24   back in 2004.  And I started losing a lot of my family
25   members, so I just kind of -- kind of dropped on out of
```

1    school.   I couldn't focus, you know.   And I haven't

2    furthered my educational career since then.   I've just

3    been working.

4    Q.    Where did you graduate high school from?

5    A.    What year?

6    Q.    Where?

7    A.    Oh, San Dimas, California.

8    Q.    Did you play any sports in high school?

9    A.    I played baseball, that was --

10   Q.    What position?

11   A.    Third and pitch.

12   Q.    So you must have had a strong arm?

13   A.    Yes, sir.

14   Q.    What was your -- what was your fast ball speed?

15   A.    Oh, it was low 90s.

16   Q.    Wow.   That's really --

17   A.    Ninety-two, I think, was my highest clocked.

18   Q.    You probably got some college looks with that,

19   didn't you?

20   A.    I left the high school team around sophomore year.

21   And I continued with city, so I kind of lost out on

22   some offers there through the high school.   But I

23   decided I was going to head on into the military from

24   there anyway to be a firefighter.   So that was my plan.

25   Q.    Okay.   So you gave up baseball.   But you graduated

1  high school and then went straight to the military?

2  A.    Yes, sir.

3  Q.    And you said you went to the Navy?

4  A.    Yes, sir.

5  Q.    Did you train in Chicago, or where did you go to

6  training at?

7  A.    Great Lakes, Illinois.  Right outside of Chicago.

8  Q.    When did you graduate from there?

9  A.    Oh, 1999.

10  Q.    And then what happened in your military career?

11  A.    Oh, went on to be a damage controlman.  Did the

12  time there.  Got out and went on to other things.

13  Q.    What is it does a damage controlman do?  I

14  apologize for my ignorance.

15  A.    Basically, a fireman.  My main objective on the

16  ship was to maintain the ship's ability to stay afloat.

17  So whatever I had to do in them terms.

18  Q.    It's a pretty important job?

19  A.    Yes, sir.

20  Q.    So did you get -- did you go to sea?

21  A.    Oh, yes.

22  Q.    Where all did you go?

23  A.    I never went overseas.  A lot of sea trials.

24  Q.    Is that the equivalent of, like, training

25  exercises?

```
 1   A.    Right.  Right.

 2   Q.    Where did you do those?

 3   A.    Mainly out of Bremerton, Washington.  And we would

 4   sail on into San Diego and back.

 5   Q.    Never got to go down to Hawaii?

 6   A.    No.  But I'm really close to Hawaii now.

 7   Q.    So how long were you in the Navy?

 8   A.    For approximately -- I was in for 15 months.

 9   Q.    It doesn't seem like a very long time.  Why did

10   you get out?

11   A.    Because of the vaccinations we were given at the

12   time.

13   Q.    So, I'm assuming, you weren't comfortable getting

14   those vaccination?

15   A.    Oh, I took them.  I had no choice.  It was

16   anthrax.

17   Q.    Well, if you took them, then what was the -- why

18   did you leave?

19   A.    Well, the first set of them gave me a bad seizure.

20   And I had to take three more in the series to complete

21   it, and I wasn't able to do it.  It was kind of like

22   all of the COVID stuff that went around, and everybody

23   that they let go for not taking COVID vaccines, trying

24   to force them to, you know; it was similar to that back

25   then, but it was anthrax.  And it was a lot worse.
```

1  Q.   So they -- military let you go?

2  A.   Yeah, because I couldn't go overseas without the

3  full set.

4  Q.   So were you dishonorably discharged?

5  A.   No.

6  Q.   So what did that -- so, I guess, it's an honorable

7  discharge for your time served?

8  A.   It was general.

9  Q.   General discharge?

10 A.   Uh-huh.

11 Q.   So about 15 months in the Navy, that would get us

12 to 2000.

13      So what did Darrell Buck do after getting out of

14 the Navy?

15 A.   Managed tire stores.

16 Q.   In California?

17 A.   I moved to Colorado --

18 Q.   Where about?

19 A.   -- with my wife --

20      Golden.

21 Q.   I hear it is pretty there.

22 A.   It is.

23 Q.   Was it an independent tire store, or was it a

24 chain?

25 A.   It was a chain.

1    Q.    What was the name of it?

2    A.    Peerless Tire Companies.

3    Q.    Fearless?

4    A.    Peerless.

5    Q.    With an F?

6    A.    P, Peerless.

7    Q.    Peerless.  My apologies.

8          How long were you at Peerless?

9    A.    Oh, probably a couple of years, I guess.

10   Q.    What do you do after leaving Peerless?

11   A.    Moved back home to California to be back with

12   family.  Ran some more tire stores there.

13   Q.    When you say you ran them, did you own these tire

14   stores?

15   A.    No, I didn't own them.  I just -- I was manager,

16   assistant manager.

17   Q.    How much would a manager or assistant manager make

18   at tire stores?

19   A.    Oh, not a whole lot back then:  $500 a week plus

20   bonuses.

21   Q.    Were you paid hourly?

22   A.    No, salary.

23   Q.    Were your bonuses, were they commissions-based, or

24   what did that look like?

25   A.    Right.  Yes.  It all depended on sales and what

1  kinds of tires were sold.

2  Q.   How long did you sell tires in California?

3  A.   Probably another two years or so.

4  Q.   Just, as an assistant manager of the tire stores,

5  I mean, what were some of your other job duties?

6  A.   In the tire store?

7  Q.   Yes, sir.

8  A.   Sales.  I was right outside doing installation as

9  well.  I would work right along with the guys; did

10 everything that they did, plus inside work.

11 Q.   And after -- after -- or when did you stop with

12 your tire job in California?

13 A.   Let's see, probably in 2003, 2004.

14 Q.   What did you -- where did you go to work after

15 that?

16 A.   I moved to the high desert and started working for

17 a fencing company.

18 Q.   When you say high desert, where -- where -- where

19 is that at?

20 A.   Yucca Valley, California; Joshua Tree, California.

21 Q.   You were living in all these great places.

22 A.   Yeah.

23 Q.   So you were doing fencing work there?

24 A.   Yeah, I did fencing there for several years.

25 Q.   What was the name of the company you worked for?

```
 1   A.    Fatty's Fencing.

 2   Q.    Fatty's?

 3   A.    Fatty's.

 4   Q.    With an F?

 5   A.    Yeah.

 6   Q.    That's an interesting name.

 7   A.    Yeah.

 8   Q.    What was your title there?

 9   A.    Installer.

10   Q.    What type of fence did you put up at Fatty's?

11   A.    Mostly chain-link, but we would do wooden fences

12   anything in between.

13   Q.    You said you were at Fatty's for several years?

14   A.    Yes, I worked for him for several years.

15   Q.    Who was your boss there?

16   A.    Josh Canady.

17   Q.    What was your job title at Fatty's.

18   A.    Installer.

19   Q.    And what did you -- what did you make at Fatty's?

20   A.    What did I make?

21   Q.    What -- what was your hourly rate at Fatty's?

22   A.    Oh, back then, it was 15 an hour.

23   Q.    Did you get any commissions or any other type

24   of --

25   A.    No.
```

1  Q.    -- bonuses?

2  A.    No.

3  Q.    Did you receive any type of employee benefits

4  working there?

5  A.    No, not there.  It was just a friend I worked for

6  for many years.

7  Q.    So after Fatty's, tell me where you went to work

8  next?

9  A.    Oh, let's see.  I guess, after that, I started my

10 own business; my dog business.  And I did that for many

11 years and worked for myself.

12 Q.    Where did you have this dog business at?

13 A.    In the high desert, where I was living there, in

14 Joshua Tree.

15 Q.    In Joshua Tree?

16 A.    Uh-huh.

17 Q.    And did you -- what was the name of your dog

18 business?

19 A.    It was Buck Wild Pit Bull Kennels.

20 Q.    I think I have an idea of what -- what that would

21 entail.

22       But, I mean, would you train these dogs, or was it

23 like a shelter?  Unpack that a little bit.

24 A.    I trained them, bred them, sold them, showed them

25 at shows.

1   Q.    How much would an average Pit Bull run for?

2   A.    Mine were from 1200 to 2200.

3   Q.    You said they would have Pit Bull shows.   What

4   does a Pit Bull show look like?

5   A.    What does it look like?   It looks like a huge park

6   full of dogs; dogs everywhere.

7   Q.    I'm sure there was -- I'm sure there were times

8   when they wouldn't get a long with each other, wasn't

9   there?

10  A.    Very rarely.

11  Q.    Really?

12  A.    It was very rare that there would be a fight

13  there.   Most of them were high, high money dogs that

14  were -- you know, they are trained and sociable with

15  kids and other animals.   That's what we strived in.   If

16  they were aggressive, they didn't belong there.

17  Q.    So after -- after the Pit Bull business -- why did

18  you stop doing that?

19  A.    Oh, it got to be a lot of work.   You don't have a

20  day off.   It's no vacation.   You don't get to go

21  anywhere.   You are just there every day.   And it -- it

22  wore on me.   I needed a change.

23  Q.    So when did you wrap up that business?

24  A.    Oh, I bred them all the way up until -- until I

25  left for Arkansas.

1  Q.    So you -- roughly until 2018, I guess?

2  A.    Yeah.   That's when I sold my last dog off.

3  Q.    So what -- what was your employment after your

4  breeding company?

5  A.    I moved to Alma.   And there I started at -- oh,

6  boy -- Wilbert's Funeral Services.

7  Q.    And what was your job title?

8  A.    Basically, I was an all-around guy there.   I would

9  deliver caskets.   I would hold funeral services.   I

10 would build, fabricate -- I was a fabricator,

11 basically.   I built the vaults, fabricated them all.

12 Q.    Were you -- were you paid hourly?

13 A.    Yes.

14 Q.    How much did you make an hour?

15 A.    It was 16 an hour there.

16 Q.    Did you receive any employee benefits when you

17 were there?

18 A.    No.

19 Q.    You were talking about your fabrication work.

20       Did you ever have to, you know, dig -- dig holes

21 in the ground and put the caskets in the ground?

22 A.    I was not a digger.   But I had to lower the vaults

23 into the ground, yes.

24 Q.    Did that require any type of special

25 certification?

| | |
|---|---|
| 1 | A.    No. |
| 2 | Q.    Did your fabrication work require any |
| 3 | certifications? |
| 4 | A.    No. |
| 5 | Q.    Did you ever have to do any welding work? |
| 6 | A.    I did not. |
| 7 | Q.    Who was your supervisor at the funeral home? |
| 8 | A.    Oh, his name was Sean.  And I cannot recall's last |
| 9 | name. |
| 10 | Q.    And why did you leave the funeral home? |
| 11 | A.    It started getting really depressing, just dealing |
| 12 | with that every day, day in and day out. |
| 13 | And then the pandemic hit, and the wife and I |
| 14 | didn't know what was going on.  It was -- it was all |
| 15 | new.  And we just decided to get out of our home and go |
| 16 | by our own home -- or our own land in the country and |
| 17 | homestead, and that's what we set out to do. |
| 18 | So, basically, I left that job.  We went and |
| 19 | bought our property.  And then I found my job at |
| 20 | Westwind from there. |
| 21 | Q.    And your wife -- you mentioned earlier -- have you |
| 22 | had any prior marriages? |
| 23 | A.    Once before. |
| 24 | Q.    When did you divorce from your first wife? |
| 25 | A.    We were married for 10 years. |

1   Q.   Roughly, when did you get married?

2   A.   Well, we actually got married in '99.

3   Q.   That was to your first wife?

4   A.   Yes.

5   Q.   Did you and your first wife have any kids

6   together?

7   A.   Two.

8   Q.   What are their names?

9   A.   Emma and Cash.

10  Q.   Cash?

11  A.   Cash.

12  Q.   C-A-S-H?

13  A.   Yes.

14  Q.   Where do they currently live at?

15  A.   Long Beach, California.

16  Q.   How old are they?

17  A.   Twenty-three and 13.

18  Q.   So you stated, after you left the funeral home,

19  you went to Westwind; is that correct?

20  A.   Yes, sir.

21  Q.   No other jobs in the interval?

22  A.   No.

23  Q.   Mr. Buck, have you ever been involved in any other

24  litigation, other than this current lawsuit?

25  A.   No, not to my recollection.   No.

1  Q.   I'm assuming you had a -- went through a divorce

2  proceeding with your first wife?

3  A.   We just signed papers.  Everything was cordial.

4  Q.   No criminal history?

5  A.   No.

6  Q.   You didn't have a drug charge in Logan County?

7  A.   Well, that's -- that's still being fought.  Yeah,

8  that's still being fought right now, so...

9  Q.   You didn't plead guilty?

10  A.   No.  I'm not guilty of that charge.  It's -- like

11  I said, it's still being fought.

12  Q.   I'm asking what you pled.

13       So you're saying you didn't plead guilty?

14  A.   No.  No, I'm fighting it.

15  Q.   Who is your attorney?

16  A.   I can't think of the name right now.  I -- I can't

17  recall the name at the moment.

18  Q.   So you say you are fighting it.  Are you fighting

19  it in Logan County?

20  A.   I am fighting it out of Logan.  Yeah.

21  Q.   Well, have you appealed that decision --

22  A.   Yeah.

23  Q.   -- or do you know where you are in that case?

24  A.   I'm still waiting.  You know, just like I've been

25  waiting all this time on this case.  It's -- everything

1  has been a waiting game.  I've just been out here

2  working my life away and waiting to hear back.

3  Q.   Us lawyers, we move pretty slow.

4       Are you currently on any prescription medication?

5  A.   No, sir.

6  Q.   So there's nothing that would influence your

7  ability to give answers in today's deposition?

8  A.   No, sir.  I'm not on any medication.

9  Q.   Do you have any special licenses from trade school

10 or anything like that?

11 A.   Just heavy -- excuse me -- just heavy equipment.

12 Q.   Tell me a little bit about that?

13 A.   Went through heavy equipment training; got

14 certified.

15 Q.   And where did you receive training at?

16 A.   Out at the high desert.

17 Q.   And is that certification -- I mean, did you have

18 to do, like, a skills test, or what did that look like?

19 A.   Yes.  Operating heavy equipment:  Like, bulldozers

20 and things like that.

21 Q.   Do you have to do a yearly test to keep that

22 license, or is it, like, a lifetime deal?

23 A.   No, it's good for, like, five years at a time or

24 so.

25 Q.   Any other special certifications or licenses that

1    you have?

2    A.    No.

3    Q.    So tell me about how you became acquainted with

4    Westwind?

5    A.    Well, I was actually given a phone number to call.

6    I thought it was a construction job, so I called the

7    number.

8         Ms. Noreen there answered and said that she was a

9    plastic welding company.  And I told her that, I guess,

10   I had had the wrong member.  I was looking for a job,

11   but not in plastic welding.  Got no idea what that was

12   about.  And she just told me to come on in and give it

13   a shot.

14        And, so, that's how that happened; by pure

15   accident.

16   Q.    Who gave you her -- or Westwind's number?

17   A.    It was a friend of my wife's at the time.

18   Q.    Do you recall who that may have been?

19   A.    Her name was Erica.

20   Q.    Erica.  Do you know --

21   A.    Devine.

22   Q.    -- her last name?

23   A.    Devine.

24   Q.    Do you know where Ms. Devine lives?

25   A.    I don't.  In Booneville.

1   Q.    So you had a phone call with Noreen.  And you guys

2   discussed what Westwind does.  Then you go in for an

3   interview, I'm assuming?

4   A.    Correct.

5   Q.    Who did you interview with?

6   A.    With Ms. Noreen.

7   Q.    And would this have been sometime in 2020?

8   A.    Yes.

9   Q.    And where did you interview at with Ms. Noreen?

10  A.    At the shop with her and her husband.

11  Q.    Whose shop was it?

12  A.    Westwind's shop.  It was the owners' shop.

13  Q.    And what did you guys discuss in your interview

14  with them?

15  A.    The main discussion was -- well, we did some test

16  cuts and welds.  And, basically, they told me that

17  whatever I learn there from them that I am not to carry

18  on anything else.

19  Q.    So you did some test cuts and welds.  What did you

20  do those on?

21  A.    Plastic.

22  Q.    Had you had any prior welding experience?

23  A.    No, I've never even heard of plastic welding

24  before.

25  Q.    That was a poor question on my part.

1      I should have said:  Have you had any welding

2  experience, whatsoever.  It didn't have to be plastic

3  welding, just any type of welding?

4  A.    Zero.

5  Q.    So on these tests, I guess, they were proficiency

6  tests to see if you could -- you had the skills needed

7  to do the job?

8  A.    Correct.  I watched the owner cut and weld.  And

9  then I followed suit and did the same thing he did.

10  Q.    And you were able to do it well enough to be able

11  to provide your services to Westwind?

12  A.    They thought so.

13  Q.    So what goes into -- what goes into a plastic

14  weld?  Tell me a little bit about that.

15  A.    What goes into the plastic weld?

16  Q.    How does the process work?

17  A.    Basically, if there is a crack or break in a bin,

18  you prep and clean your crack or break.  You cut into

19  it and kind of widen it out, clean it out.  And then

20  you use one of their specialty welding guns that shoots

21  plastic out at 400 or 500, or something like that,

22  degrees.  And then you let that dry in there.  And then

23  you grind that down and sand it down and smooth it out.

24  Q.    It sounds pretty technical?

25  A.    Sounds technical, but it's not.

1   Q.   So these specialty welding guns, were they just

2   made for this type of welding?

3   A.   Yes, sir.

4   Q.   So you did -- you did a test -- a test weld with

5   Westwind.  After that, what happened?

6   A.   They gave me a hire date and told me to come and

7   start.

8   Q.   And do you recall when they told you to come

9   start?

10  A.   I do not.

11  Q.   It would have been sometime towards the end of

12  2020, wouldn't it?

13  A.   Possibly.

14  Q.   Whenever Westwind told you to come start, did you

15  sign any paperwork or anything to that effect?

16  A.   Yes, they made me sign something.

17       And, I -- honestly, I don't really recall exactly

18  what it was.  But I know that I wasn't real keen on

19  signing it.  But it was -- at the time, it was like --

20  I don't know.  They were kind of bullies.  Kind of made

21  me feel like I had to sign it in order to start the

22  job.

23       And, anyways, I have been trying to obtain that

24  paperwork since, and they refuse to give it to me.  So

25  I don't remember or recall what was even on it.

1  Q.    Well, you mentioned there was specialty plastic --

2  plastic guns.  Was it a confidentiality agreement that

3  they may have had you sign?

4  A.    I don't recall exactly.

5        They were wanting -- I know part of it had to do

6  with not carrying the trade anywhere else.  It was for

7  them only.  And also something about being an

8  independent subcontractor.

9        You know, and I was telling them, "Well, I'm not.

10 I'm not an independent subcontractor.  This is -- I

11 mean, this is an employee position."

12       And -- but, anyway, they kind of made me sign that

13 paperwork, stating --

14 Q.    Did they tell you what --

15 A.    -- stating that I was an independent contractor,

16 and that I was renting tools from them, and all kinds

17 of things.  But I was -- I never rented a tool from

18 them or nothing.  I just used everything that they had

19 there.

20       So it just -- it made me feel uncomfortable,

21 because it made me feel like I was lying on my W-2s and

22 taxes, because of the way they were forcing us to make

23 our invoices and stuff as independent subcontractors;

24 which we were not.

25 Q.    What's the basis for thinking you weren't an

1    independent contractor?

2    A.    Because I was not a skilled welder that came in as

3    an independent contractor.

4         I showed up there not knowing anything about the

5    job.  I didn't get to make my own hours, my own days.

6    I couldn't even wear my own clothes.  I had to wear

7    their clothes; had to use their tools; had to take

8    their breaks at their time.

9         That doesn't sound like an independent

10   subcontractor.  That sounds like a full-time employee

11   from 6:00 to 2:30 Monday through Friday.

12   Q.    Did they give you a uniform policy?

13   A.    They made us wear a uniform, yes, because of

14   COVID.

15   Q.    Okay.  Did -- did you sign an employee handbook

16   with Westwind?

17   A.    Like I said, I signed something.  But they

18   wouldn't -- they wouldn't give me copies of anything.

19   They refused to, Ms. Noreen.

20                MR. HOOKS:  Will you mark, Sue, I think

21           it's Number 2?  Can we share the screen on

22           this?

23        (Wherein, an off-the-record conversation was

24               held.)

25   BY MR. HOOKS:

1  Q.   Mr. Buck, can you see the screen that we are

2  sharing that?  It says Independent Contractor

3  Agreement.

4  A.   Yes.

5  Q.   Is that your signature there on this agreement?

6  A.   Yeah.

7  Q.   It looks like it is dated January 12th, 2021?

8  A.   January 12th, '21.  Okay.

9  Q.   Do you see that?

10  A.   Yes.

11  Q.   And it says, "The Company hereby engages the

12  contractor as an independent contractor to perform the

13  services set forth herein"; can you see that?

14  A.   Yes.

15  Q.   (Audio malfunction).

16  A.   And that is the exact piece of paper I was asking

17  for for weeks.  And that is the one that I didn't want

18  to sign.

19      That's -- but they made me sign in to start.  I

20  was -- I was talking to them at our interview, saying

21  that it didn't make sense, though; because,

22  technically, I'm not an independent contractor of any

23  kind.

24      And they said, "Well, this is just something we

25  have to do for tax purposes."

 1      And so, you know, they falsified it.  I mean,

 2  they, yeah, made me --

 3  Q.    Well, but you signed it, didn't you?

 4  A.    (Audio malfunction).

 5      Yeah, I did.  I signed it for a job.

 6      But, like I told them, I'm not -- I'm not an

 7  independent contractor, so I shouldn't be signing this.

 8  Q.    But you voluntarily signed it, correct?

 9  A.    Yeah, I did.  Yeah.

10  Q.    And you could have --

11  A.    But doesn't mean I'm an independent contractor.

12  It means that, basically, they wanted me to lie for

13  them.

14  Q.    But, if you didn't want to sign this, you didn't

15  have to sign it?

16  A.    Well, then I wouldn't have had the job for them.

17  Q.    And that was within your control; to sign it or

18  not to sign it?

19  A.    Yeah.  It was either that or, you know, like I

20  said, not have a job at the moment.

21  Q.    Do you see the fourth paragraph down.  It says,

22  "This agreement shall not render the contractor an

23  employee"; do you see where it says that?

24  A.    Where -- what are you reading now?

25  Q.    It's the fourth paragraph first sentence "This

1  agreement shall not render the contractor an employee,

2  partner, agent of or joint venturer with the company

3  for any purpose"; do you see where it says that?

4  A.   Okay.

5  Q.   So you agreed to that term by signing this

6  document, didn't you?

7  A.   No, I didn't agree to it.

8  Q.   But you signed the document, right?

9  A.   Yes.  Yes, I did.

10  Q.   So, if you sign an agreement, doesn't that mean

11  you agree to something?

12  A.   I'm sorry.  Can I take one quick break.

13       Yes, I did sign it.  Yep.

14            MR. HOOKS:  Yes, we can -- we can take a

15         break, Mr. Buck.

16            THE WITNESS:  Okay.  I'll be back real

17         quickly.

18            MR. HOOKS:  Off the record.

19       (Wherein, a break was taken from 11:49 a.m. to

20            11:52 a.m.)

21       (Wherein, an off-the-record conversation was

22            held.)

23  BY MR. HOOKS:

24  Q.   So, Mr. Buck, we were discussing this Independent

25  Contractor Agreement that you had agreed that you had

1    signed.

2         I think you were stating that you disagreed

3    with -- with the contents of this agreement; is that

4    correct?

5    A.    Yeah, I disagreed with the whole contract.

6                   MR. HOOKS:  Sue, will you scroll down to

7           Page 2.

8    BY MR. HOOKS:

9    Q.    Mr. Buck, this is Page 2 of the Independent

10   Contractor Agreement; is that your signature?

11   A.    It is.

12   Q.    So, again, prior to you starting to provide your

13   services to Westwind, you admit to signing an

14   independent contractor agreement; is that correct?

15   A.    I signed it for them.  Sure.

16                   MR. HOOKS:  Sue, can we mark this as

17          Exhibit 1.

18                   THE COURT REPORTER:  Yes, sir.

19        (Wherein, Deposition Exhibit 1 was marked.)

20   BY MR. HOOKS:

21   Q.    Mr. Buck, before you started providing your

22   services to Westwind do you recall signing a W-4 or an

23   Employee Withholding Certificate?

24   A.    No.  Not that I can recall.

25   Q.    So --

1   A.   Like I said, I've been trying to obtain my whole

2   hire packet, everything that I've signed from them

3   since I started.  And they refused to give it to me.

4   So I don't really remember what all was in there.

5   Q.   So, whenever you started providing your services

6   to Westwind, what was your -- what was your position?

7   A.   They started me out as a plastic-welder; that was

8   my title.

9   Q.   And was your -- what were your job duties as a

10  plastic-welder?

11  A.   My duties were to repair broken and cracked bins.

12  Q.   And what was your pay structure?

13  A.   I believe they started me at 14 an hour.  And I

14  was promised a dollar raise every so often.

15       And, you know, by the time I -- by the time they

16  let me go, I should have been at $20 an hour.  But they

17  had us at 17.  They just kept promising us our raises

18  and not giving them to us.

19       So it went from 14 to 17.

20  Q.   So you weren't paid on a piece rate by the amount

21  of bins that you welded?

22  A.   No.  Hourly.

23  Q.   Were you required to submit invoices --

24  A.   Yes, sir.

25  Q.   -- to Westwind?

1          So how did that work?

2     A.    We wrote out a weekly invoice to get paid per

3     hours that we worked; not per bins that we worked on.

4     Q.    So these invoices, they would show the amount of

5     bins that you welded or repaired?

6     A.    No.   No.

7     Q.    They wouldn't?

8     A.    No.

9     Q.    What would these invoices show?

10    A.    Our hours.   And the times that we worked -- and

11    they had us putting minus $27 on them invoices, to say

12    that we were renting tools from them.   But we were

13    never renting any tools from them.   That was just

14    something else made up for their tax games.

15    Q.    Did you do this plastic bin repair in Westwind's

16    shop?

17    A.    Okay.   So -- okay, so I take that back.

18          I'm looking at one of my invoices here, sir.   And,

19    basically, what they would have us write down is:   They

20    would have us write down our name, and then it would

21    say so many bins at this amount; less rent, $27.

22          And this is all absolutely made up.   This is -- I

23    don't even know what these numbers are for.

24          We've asked them, "What's the less rent $27.

25    You're not taking $27 out of our pay.   We're not

1   renting your tools in any way."

2       Okay, that's less rent 27 here on my invoice.

3   That's -- that's made up by Westwind.  I didn't less

4   rent nothing.

5       Okay.  The six bins at 79.16.  I don't know where

6   they get those numbers from.  That's just the numbers

7   they tell us to write in, okay?

8       And that's how they get by with making it look

9   like we are independent subcontractor, I believe.

10  That's -- that's how they are getting away with it.

11  Q.   So what -- if you don't mind me asking, Darrell:

12  You mentioned six bins.  What -- what is the date of

13  that invoice that you have?

14  A.   Oh, like the first one I just read off, that one

15  says 1/15/21.  That's the very first one I wrote on for

16  them.

17  Q.   So you would submit these invoices?

18  A.   Yeah.  Once a week.

19  Q.   For payment?

20  A.   Yep.

21  Q.   And so you are saying --

22  A.   But that pay -- but that pay is actually our

23  hourly pay.  It has nothing to do with the bins or the

24  rent or nothing like that.

25      So, if you add up that week's pay and divide it by

1   the pay I was getting paid, that's what that number

2   comes out to.

3        So they just have us making up numbers for them.

4   Q.   You're saying this entire invoice system was just

5   made up; that you weren't paid per bin?

6   A.   That's 200 percent what I'm saying.  Absolutely

7   correct.

8        I was getting paid per hour; not per bin, like it

9   says on here.

10       And I was not paying $27 a month to rent any

11   tools.  That never ever came out of our checks.  That's

12   just something that they made us do to keep our job.

13  Q.   Well, the checks that you received, would it be

14  the amount on the invoice after --

15  A.   Yes.

16  Q.   -- after the -- let me finish my question.

17       It would be the amount on the invoice, less the

18  rent, would be what would be on the checks?

19  A.   No.  It would be at the exact amount of the

20  invoice that I wrote down; which would turn out to be

21  my hourly pay.  That's what was on the checks every

22  week by Ms. Noreen, my hourly pay rate; what I worked.

23  Q.   Let's talk about your time at Westwind and what a

24  typical day looked like.

25       So was the shop open Monday through Friday?

1   A.   Yes, sir.

2   Q.   What time did the shop open?

3   A.   It would -- it would be open as early as 5:00 a.m.

4   Q.   Did you have a key to the shop?

5   A.   No, it would be unlocked.

6   Q.   Tell me about when you met William Catlett?

7   A.   William Catlett.  Okay.  He was an employee there.

8   Q.   So you met him after you started providing your

9   services to Westwind?

10  A.   Yes, he started there after I did, at some point.

11  Q.   He said the shop opened at 6:00 a.m.; would you

12  disagree with him on that?

13  A.   Yeah, I would disagree.

14  Q.   But it's your position the shop would open at

15  5:00 in the morning?

16  A.   We -- we started work at 6:00 a.m.  They expected

17  us to be suited up and at our stations at 6:00 a.m.

18       So we were getting there at 5:30, doing their

19  sanitizing and everything else and changing out of our

20  clothes and putting their clothes on and getting

21  sprayed down and their whole -- their whole game they

22  played every morning before we got to our bins at

23  6:00 a.m.

24  Q.   So this sanitizing process --

25  A.   Uh-huh.

1  Q.    -- tell me about that.

2  A.    Well, you walk in.   Sometimes you are standing in

3  a line waiting on Ms. Noreen to show up to come and

4  take your temperature.

5      And then you walk through a tray of who knows what

6  to eat away your work boots that they don't replace.

7  And then be sprayed down, and then go and put on their

8  uniforms, okay?   And then come back through and get one

9  more temperature on the way to our bins -- to our

10  workstation.   So however that long that took every

11  morning; it all depended on where you were in the line,

12  I guess.

13  Q.   Well, you said -- you mentioned your boots.   Would

14  you step in, like, a trough or a bath to sanitize them?

15  A.    Yes.   A big plastic tray that they would have us

16  walk through, and it would just eat our boots up.   And

17  we don't know what it was.

18  Q.   How long would it take to walk through that?

19  A.    Seconds.   Seconds, for that part.

20  Q.   How long would it take to get a temperature

21  reading?

22  A.   It all depends on when Ms. Noreen would show up.

23  Sometimes we would be there waiting five minutes;

24  sometimes 10 minutes.

25      And, once she got -- finally got there, sometimes

1   it wouldn't even read.  So she would have us go and

2   stand by the door until they could get it to properly

3   read.

4        And then they would have us come through, "Okay,

5   let's check and see if it's working correctly.  Okay,

6   this time it is.  Okay.  Now, you can go get changed

7   out."

8        "Oh, no; it's still not working.  Go ahead; wait

9   another few minutes."

10       Okay.  It was like this every day on my time.

11   Q.   So was the -- with your boots and then the

12   temperature.  Was there any other sanitation procedure

13   you would have to do?

14   A.   (Audio malfunction) scrub our hands off and get

15   sprayed down by them, and change into their uniforms.

16   And there was only three changing -- changing rooms

17   made up there that they made; makeshift change rooms

18   that they made.  And so, at times, there was -- there

19   was up to, like, 16 of us at a time.  And we are all

20   having to take turns and wait; you know, waiting for

21   all of these guys to change out before you can get in.

22       And, yeah; it was just kind of a joke.  It was

23   unorganized.

24   Q.   How long would it take to wash your hands?

25   A.   A minute.

1   Q.    Now, with your uniform, so I imagine -- and

2   correct me if I'm wrong on this -- you would show up to

3   the shop and then change clothes?

4   A.    Yeah.  I would show up at least 5:30 every morning

5   to get in the door to be ready and at my bin by six.

6         And sometimes it would take, you know, longer

7   than, you know, cutting into work time.  But I was

8   getting paid hourly anyways, so it didn't really

9   matter.

10  Q.    What type of uniform did you have, Darrell?

11  A.    Work pants and a button-up work shirt and jackets.

12  Q.    Work pants, are we talking blue jeans?  What are

13  we talking here?

14  A.    Yeah, like blue jeans.

15  Q.    Were your shirts short-sleeved, long-sleeved?

16  A.    Short.  Button-up.

17  Q.    Did your uniform clothes match the uniform clothes

18  of the other contractors?

19  A.    Yes.

20  Q.    Did you wear the exact same uniforms every single

21  day?

22  A.    They had a different uniform for us for each day

23  of the week.

24  Q.    So every single day, you and all the other

25  contractors had the exact same pants on, the exact same

1    shirt on; is that what you're saying?

2    A.    For the most part.

3          I mean, some of them were a little different here

4    in their; different pants or different shirt.  It all

5    depended on what Cintas, the uniform company, decided

6    to bring.

7    Q.    Did you have -- on your shirt, was there a name

8    patch that said Westwind on it?

9    A.    No.

10   Q.    Or anything on your uniform that said Westwind on

11   it?

12   A.    No.  They just ordered Cintas uniforms.  They

13   didn't have their company name put on them.  They just

14   ordered the uniforms and made us put them on.

15   Q.    You were -- if you had blue jeans and a

16   short-sleeve shirt -- they ordered that -- why couldn't

17   you just wear your own blue jeans?

18   A.    That's what -- ask them.

19         It was a control thing because of COVID.  They did

20   not want our outside clothes inside their shop.  So

21   they would halt us at the door and make us play these

22   games every day and change into their uniforms to go to

23   work.

24   Q.    I guess, you didn't think COVID was that big of a

25   deal?

1   A.    That's -- that's personal preference, you know.

2   I've been through a lot worse.

3        And I never got COVID.  I never had the vaccine.

4   Q.    When you were at Westwind, did any contractors

5   contract COVID that you recall?

6   A.    Supposedly.  I don't know for sure.  I never saw

7   tests.

8   Q.    You stated, when you were at Westwind, you were

9   paid weekly; is that correct?

10  A.    Correct.  Most of the time.

11  Q.    When you were at Westwind, did they have a

12  retirement account set up for you?

13  A.    No.

14  Q.    Did they have or give you health insurance?

15  A.    No.

16  Q.    Give you life insurance?

17  A.    No.  I didn't have nothing like that.

18  Q.    They would just cut you a check every week?

19  A.    Right.

20  Q.    Well, let's talk about -- let's keep talking about

21  typical day at Westwind.

22       So you put on your uniform, sanitize.  What would

23  you do after that?

24  A.    Go to my workstation.

25  Q.    Did you have your own workstation in the shop?

1   A.    They rotated us around.

2   Q.    So you might have one workstation one day, another

3   workstation the next day; is that what you're saying?

4   A.    Correct.  Correct.

5   Q.    But, for any particular day, that would be your

6   workstation?

7   A.    Correct.

8   Q.    You stated that you were a plastic-welder.

9         Did you weld bins for Westwind?

10  A.    Correct.

11  Q.    How would that work?  Would you go and pick up a

12  bin, or how would you get a bin in your work- --

13  A.    We have a piece of paper hanging on a clipboard.

14  And each bin would have its own invoice, I guess.  And

15  you go up, and you take the next paper in line off of

16  that clipboard.  You find the number of that bin; go

17  match it with the bin.  You take that bin back to

18  wherever workstation they have you that day.  And you

19  repair that bin.  You get done.  You put it in the

20  middle of the shop for inspection.  You go get another

21  piece of paper.  And you do it all over again.

22  Q.    So would there be a designated portion of the shop

23  that had repaired bins?

24  A.    Correct.  Right in the center of the shop.  We

25  would put them right in the center when we were done.

1   And they would be inspected.  And then they would be

2   taken out to put in a truck.

3   Q.   Would there be -- and, I'm assuming, there would

4   be another space in the shop for unrepaired bins?

5   A.   Correct.

6   Q.   So, just so I'm understanding:  You go to the

7   unrepaired bin pile, find a bin number, take it back to

8   your workstation?

9   A.   Correct.

10  Q.   And then you'd repair that bin, and then place it

11  in a completed-bin or a repaired-bin part of the shop?

12  A.   Correct.

13  Q.   About how long would you estimate it would take

14  per bin?

15  A.   There's no telling, sir.  It could be a small

16  crack that could take 15 minutes or less.  And it could

17  be up to replacing the whole base of it; which could

18  take, you know, upwards of a couple of hours replacing

19  a base and the other repairs needed on it.  So every

20  single bin varied in time.

21  Q.   So, I guess, some bins would be more of a complex

22  weld than others?

23  A.   Correct.

24  Q.   Could you tell by looking at these bins, Oh, this

25  is an easy repair; Oh, this is a more difficult repair?

1   A.   Well, yeah.  It's pretty obvious when you see the

2   breaks.

3   Q.   Was there any specific order in which you had to

4   repair these bins?

5   A.   In order that they come in.  You just take the

6   next one in line off the clipboard; whatever they've

7   got up there.  Whatever they have ready.

8   Q.   So would you -- would it be one bin a time at your

9   workstation?

10  A.   Correct.

11  Q.   On these invoices that you've discussed, you'd

12  mentioned that you weren't paid per bin, right?

13  A.   Right.  I was being paid per hour; 14 an hour.  I

14  ended at 17 an hour.

15  Q.   Did you testify earlier that the amount on these

16  invoices -- like, if it said 12 bins, would that

17  actually be the amount of hours that you worked?

18  A.   I don't know -- I don't know where they got those

19  numbers from; that's where I'm saying.

20       All I know is the total that I have on the bottom

21  of the invoice matches my hours worked for that day.

22  That's all I know.  The other numbers, they make us

23  make up.

24  Q.   Hold on.  So the number at the bottom, you said

25  that matches the amount of hours you work that day?

1   A.   Not -- for the week.  The week.  I'm sorry.

2        If you divide my hourly pay into the amount that I

3   put on the bottom of each invoice, that's going to give

4   you my hours.

5        It's -- it's not going off of their bins or going

6   off of their less rent or anything.

7        That total -- total amount at the bottom of each

8   invoice, that is my -- my pay -- my hourly pay at

9   whatever hours that I've worked for that particular

10   week.  That's what that number is.

11        That has nothing to do with their bins or anything

12   else.

13   Q.   You said that --

14   A.   For instance -- for instance, on this very first

15   invoice that I'm -- I have, it says, "Six bins at

16   79.16, less rent 27."

17        But down here it says, "475 minus 27 is 448."  So

18   where does the 475, come from?  Well, the 475 comes

19   from my hourly pay plus $27 less rent that I never

20   actually pay.  That's false.  But they make us add 27

21   on top of our hourly pay to make it look like we are

22   paying something; but we're really not.  So that 448 is

23   my hourly pay.  This 475, that's just tacking on

24   their -- their rent; which we never ever paid.  Okay?

25   This is -- they are false.  (Audio malfunction).

1   Q.    Okay.   Mr. Buck, I appreciate that explanation.

2        Can you go ahead and give me the date on that

3   invoice again that you were --

4   A.    Yes.   That was my very first one for them.   That

5   was January 15th of 2021.

6        And every single invoice I've ever written for

7   them is false.

8              MR. HOOKS:   Let's go off the record a

9         second.   Let's take a five-minute break.

10        (Wherein, a break was taken from 12:17 p.m. to

11             12:25 p.m.)

12   BY MR. HOOKS:

13   Q.    Okay, Mr. Buck, we were talking about these

14   invoices and your compensation from Westwind.

15        I believe you testified that you -- it's your

16   contention that you were getting paid $14 an hour when

17   you started?

18   A.    Correct.

19   Q.    And then, did you say, it went to 15?

20   A.    I -- it was 17 when they let me go.

21   Q.    And when did your time with Westwind end?

22   A.    It was August -- I can't remember the exact date

23   now.   But August of '21.

24   Q.    '21 or '22?

25   A.    '22.   I'm sorry.   August of '22.

1  Q.   And why did your time with Westwind come to an

2  end?

3  A.   Well, it came to an end because I contacted OSHA.

4  Q.   What was that about?

5  A.   Unsafe practices in the shop.

6  Q.   And there was no merit to that charge, was it --

7  wasn't there?

8  A.   I'm not sure.

9  Q.   OSHA didn't find in your favor, did they?

10 A.   No.  No.

11 Q.   So Westwind wasn't -- wasn't punished for that

12 charge, were they?

13 A.   I guess not.

14 Q.   And you filed a retaliation charge against

15 Westwind, as well, didn't you?

16 A.   Retaliation?  No.

17 Q.   With OSHA?

18 A.   That was not retaliation, no.

19      It was, basically, they were trying to raise me up

20 on their forklifts without being harnessed or anything.

21 And I wasn't safe -- feeling safe doing that.

22      And I told them, if they were going to force me to

23 keep getting up there, I would be contacting OSHA.

24      And told me, "Well, if you contact OSHA, we will

25 let you go immediately."

1          And they made me get up on the forks, again, the

2     owner.  And so I contacted OSHA and let them know that

3     I don't feel safe being raised up there.  There's no

4     harnesses; no one is certified on the forklifts that

5     are operating it.

6          And, as soon as they found out I contacted OSHA,

7     they terminated me and said that it was because I was

8     late.

9          But Noreen told me that she would terminate me on

10    the spot if I contacted OSHA for any reason.

11    Q.   Again, that OSHA complaint that you filed, they

12    didn't issue any charge against Westwind, did they?

13    A.   I guess, they didn't.  I was terminated, and so I

14    don't know.

15    Q.   Well, didn't you receive paperwork from OSHA about

16    that --

17    A.   Yeah, they -- I guess, it was dropped.  You know,

18    I don't know.

19         Maybe they promised OSHA that they would never

20    raise -- force anyone up on their forks again.  I -- I

21    don't know what happened.

22    Q.   Did you receive any compensation from OSHA or any

23    government agency after you filed that OSHA charge?

24    A.   No, sir.

25    Q.   Did you receive any type of benefit from Westwind

1   or OSHA or the Department of Labor in relation to that

2   charge?

3   A.   No, sir.

4   Q.   Now, Mr. Buck, you talked today about, you know,

5   your work at Westwind.  You stated, I believe, that you

6   had to be at the shop at a certain time; is that

7   correct?

8   A.   Yes.  They expected us to be at our workstation

9   starting at 6:00 a.m. every morning.

10       So, obviously, we would have to be there, you

11  know, early to get ready and go through everything that

12  we had to go through to get there at 6:00 a.m.

13  Q.   Was written policy stating you had to be at your

14  workstation at 6:00 a.m.?

15  A.   I don't know, because I never received -- like I

16  said, I was trying to get that packet.  And I never got

17  it; my hire packet.  I wanted to read over it all

18  carefully.  And they just wouldn't give it to me.  So I

19  don't recall.

20       But they expected us to be at our bins, at our

21  workstation, starting at 6:00 a.m.

22  Q.   My question is -- it's simple:  Do you have that

23  policy in writing?  Did they give that to you?

24  A.   They didn't give me anything in writing.  They

25  kept everything.  So, no, they did not.

1    Q.    Do you know if such a policy exists?

2    A.    Not that I can recall.  I don't know.

3    Q.    When did Westwind's shop close down for the day?

4    A.    We were done working at 2:30.  And, then, we would

5    go and change back into all of our clothes.

6    Q.    How long would it change into your personal

7    clothes?

8    A.    That varies.  Sometimes I was there until 3:00

9    o'clock, 3:45 on some instances.  It all just depends

10   on who would race to get changed first.  Like, you

11   know, there -- there is a line.  You got to wait for,

12   you know, sometimes up to 15 other guys to get changed

13   in three changing rooms.  So, yeah, it took -- it took

14   a bit of time.

15   Q.    The act itself --

16   A.    I was usually out of there by 3:00 o'clock.

17   Usually, on a normal day.

18   Q.    Did Westwind ever tell you that you couldn't work

19   for somebody else when you were providing your services

20   to Westwind?

21   A.    Yes, they did.

22   Q.    Who told you that?

23   A.    Mark and Noreen.

24   Q.    So, it's your position, they told you you can't

25   work for anybody else?

```
 1   A.    Correct.

 2   Q.    Was there a written policy on that?

 3   A.    I don't know.  There may have been in the hire

 4   packet.  I don't know.

 5   Q.    You didn't work for Grubhub?

 6   A.    For what?

 7   Q.    Grubhub?

 8   A.    Grubhub.  I don't know what Grubhub is.

 9   Q.    You didn't drive -- drive and deliver meals for

10   Grubhub?

11   A.    No.  I have no idea what -- I've never heard of

12   Grubhub.

13   Q.    You're sure about that?

14   A.    Grubhub?  I've never heard of Grubhub.  I have no

15   idea what you're talking about.

16   Q.    Food delivery service?

17   A.    I've never heard of it.

18   Q.    So you never -- never provided your services

19   anywhere else when you worked at Westwind?

20   A.    No, I did not.

21   Q.    So, let's say, you'd leave at 3:00 p.m. on any

22   given workday.  What would you do after you left

23   Westwind?

24   A.    Drive back out to the country to my property.

25   Q.    You wouldn't receive income from any other
```

1  individual or company?

2  A.    No.

3  Q.    You wouldn't go and mow somebody's yard and get

4  paid for that?

5  A.    No.

6  Q.    You wouldn't do any mounts?

7  A.    I guess, I did some Euros back then.  But it was

8  nothing that I was in business for at the time.  That

9  was free.

10  Q.    Who did you do the mounts for?

11  A.    A couple of the locals.

12  Q.    Who --

13  A.    I never charge them anything.

14  Q.    Who?

15  A.    Just some of the local hunters that would stop by

16  and ask me if I could help them out.

17  Q.    I need their names.

18  A.    William was one.  Shane was another.  And there's

19  one other guy, Pat.  So I've probably done three out

20  there.

21  Q.    I'm assuming you don't know their last names?

22  A.    No.

23  Q.    What types of mounts did you do for them?

24  A.    Bucks, Euro mount.

25  Q.    Did you receive income from any other source while

1   you were providing your services to Westwind?

2   A.    No.

3   Q.    How did you keep track of your hours that you'd

4   worked at Westwind?

5   A.    I just wrote them down.

6   Q.    Where would you write them at?

7   A.    On a notepad.

8   Q.    Did you give that notepad to Westwind?

9   A.    No.  But it was left in their toolbox when they

10  terminated me.

11  Q.    So you don't have possession of that?

12  A.    I have all of my invoices.

13  Q.    Would you keep your invoices in your toolbox?

14  A.    No.  I kept them on me.

15  Q.    But you wouldn't keep your hours worked?

16  A.    I didn't need to.  It was on a big yellow pad in

17  my toolbox.  I would just mark down every day.

18       Not that I needed to, because I knew what time I

19  got there and what time I left every day.  So, I mean,

20  it was kind of pointless.  But, every once in a while,

21  if I had to take off somewhere, I would jot that down;

22  or if I had to come in late, I would jot that down.

23       But, technically -- for the most part it was

24  6:00 a.m. to 2:30, so it was pretty easy to keep track

25  of.  I was stuck working on their hours.  I didn't get

1    to make up my own, so...

2    Q.    You didn't take that with you?

3    A.    No.

4    Q.    So you don't have any idea where that, I guess,

5    notebook would be?

6    A.    I do not.  Because they let me work a full day.  I

7    got off at 2:30.  And on my way home, at some point, I

8    got a text message that I was terminated.  So they went

9    ahead and let me work that whole day, and then they

10   made something up about me being late and terminated

11   me, so...

12   Q.    Whenever you were providing your services to

13   Westwind did you punch a time clock?

14   A.    Not until towards the very end, when they were

15   changing us from 1099 to W-2.  And I may have punched

16   in for a week or less.  And then they took -- and then

17   they put me right back on 1099 again.

18   Q.    Explain that to me?  So they switched you to being

19   a W-2?

20   A.    No.  We were all 1099.  And, basically, they

21   wanted to try something new.  I don't know what they

22   were trying to do; scamming something else.  And they

23   wanted to change us all to W-2.

24         However, they got to pick and choose which

25   employees they were going to make W-2 and which ones

1   they weren't.  You know, like, if some of the guys were

2   late or you were slacking off, "Nope.  You're staying

3   on 1099.  But all of you are going to be W-2."

4       So she made me W-2.  And then when she got upset

5   catching wind about me contacting OSHA, she knocked me

6   right back down to 1099.  And that's where I remained

7   until I left -- until -- a short time after that is

8   when she terminated me.

9   Q.   I thought you said she would -- was going to

10  terminate you if you contacted OSHA?

11  A.   She did.  And, as soon as she found out, when OSHA

12  contacted her, she terminated me.  It was probably the

13  same day.  It was a Wednesday.

14  Q.   On these welds, these plastic bin -- bins that you

15  were working on, did they have to meet a certain

16  quality standard?

17  A.   Yes.

18  Q.   Is it USDA quality?

19  A.   I don't know about that.  It's Mark, the owners',

20  quality; whatever he is happy with.

21  Q.   When you were doing these welds, would Mark be

22  watching you at all times?

23  A.   No.

24  Q.   So you are kind of left to your own devices to get

25  the weld done at your workstation?

1   A.   For the most part

2   Q.   (Audio malfunction).

3   A.   You would have a supervisor walk around and check

4   in on us periodically.

5   Q.   Would the hours you spent at Westwind -- for you

6   to be paid, would you not submit the hours you worked

7   for that week?

8   A.   Say again?

9   Q.   For you to get paid every week --

10  A.   Right.

11  Q.   -- did you submit the invoices?

12  A.   Right.

13  Q.   Is that correct?

14  A.   Yeah.   Ms. Noreen would come by every Friday

15  around lunchtime or so and collect our invoices.   And

16  then at the end of the day, she would hand us our

17  checks.

18       Which that was a whole 'nother thing.   We would be

19  off at 2:30.   We should have had our check sitting in a

20  box or something.   But we would be hanging out until

21  3:00 o'clock, 3:15, waiting to get our checks handed to

22  us.

23  Q.   And, if you just gave her the invoices, it

24  wouldn't show the amount of hours you worked, would it?

25  A.   It does.   Because she takes our -- our total

1   amount at the bottom of the invoice, and she divides

2   that by our hourly pay, and that tells her how many

3   hours we worked.  And that's how she -- she trained us

4   how to make these invoices -- her, personally;

5   Ms. Noreen.

6        So these numbers that are on here that mean

7   nothing, those are numbers that she made up.

8   Q.   But it doesn't say on the invoice how many hours

9   you worked?

10   A.   It does not say my hours, no.

11        But my hours, 14 an hour, divided by my first

12   check comes out to the hours that I worked, is what I'm

13   saying.

14   Q.   Mr. Buck, do you pay your taxes every year?

15   A.   I do now, yes.

16   Q.   You do now.  So, I'm assuming, you haven't paid

17   taxes --

18   A.   I do every year, yes.

19   Q.   You file a tax return every year?

20   A.   Yes.

21   Q.   Who is your accountant?

22   A.   My wife usually does our taxes.

23   Q.   Do you file jointly?

24   A.   Yes.

25   Q.   You never -- you don't use a CPA, or you haven't

1  used a CPA at any time in the last three years?

2  A.   No.   My wife does our taxes, so...

3  Q.   And she has filed for 2021; is that correct?

4  A.   Yes.

5  Q.   She's filed for 2022?

6  A.   Yes.

7  Q.   Do you have copies of those tax returns?

8  A.   I do somewhere.

9  Q.   Well, I've asked you to produce those to me.   Why

10  haven't you done so?

11  A.   I thought we had.

12  Q.   You have not.

13  A.   Okay.   Well, we will have to get them to you.

14  Q.   Okay.   So you agree to provide me those?

15  A.   Absolutely.

16  Q.   So you were talking about Westwind switching you

17  to being an employee.   And, then, you stated that you

18  went back to being a 1099 contractor.   Do you recall

19  the particular month when that occurred?

20  A.   It was either the very -- it was towards the end

21  of July, I want to say.   Yes.   Mid to late July.

22  Q.   They didn't switch you back to being a contractor

23  because you were complaining -- complaining about taxes

24  being withheld, did they?

25  A.   No.   No, they switched me back because she was

1   upset with me, basically.

2   Q.   Was that because you were missing work frequently?

3   A.   No.   No.   It had nothing to do with that.

4        And, if I was a subcontractor, it wouldn't matter

5   if I was missing work.

6        But, no; it had nothing to do with that.   It had

7   to do with me contacting OSHA.

8   Q.   Were you given an attendance policy whenever you

9   were providing your services to Westwind?

10  A.   I don't recall an attendance policy.   But they

11  were -- they were -- you know, they were kind of stern

12  on their hours.   They wanted us at the bins from --

13  they expected us to be at the bins from 6:00 a.m. to

14  2:30.

15  Q.   So is it your position, if you were an independent

16  contractor, you would be free to come and go as you

17  please?

18  A.   Say again?

19  Q.   If you were an independent contractor, you'd be

20  able to leave the shop whenever; is that -- do you

21  agree with that statement?

22  A.   That's -- that's usually what independent

23  contractors do; they come and go at their own times and

24  hours.   And, I mean, as long as it's -- you know, shop

25  is open and, you know, you have open access.

1      Independent subcontractors, they usually don't

2  have a set time.  They are not usually called and told

3  by an owner, "Okay.  You are going to have to be here

4  from 6:00 to 2:30.  And you can't leave before 2:30.

5  But I expect you to be right here right at 6:00."  It

6  don't work like that.

7  Q.   When you were at Westwind, did you frequently have

8  days when you weren't -- weren't there or leave early?

9  A.   I don't know frequently.

10      I mean, everybody had things that they had to take

11  care of, you know.  So, it's not like I'm being singled

12  out.  Everybody kind of had stuff that they would have

13  to do; take a day off or leave early or come in late.

14  You know, everyone has personal things going on.

15      Kind of like today, I'm missing out on all kinds

16  of money in construction to do this.  So it's, like,

17  things like this come up.

18  Q.   You were never let go by Westwind for missing

19  work, were you?

20  A.   No.

21  Q.   Did you go to jail for your drug charge?

22  A.   I was in jail.

23  Q.   How long?

24  A.   I think it was four days.

25  Q.   Westwind didn't let you go for missing during that

1 time, did they?

2 A.   No.

3 Q.   You went back to providing your services for

4 Westwind after that?

5 A.   Yes, sir.

6 Q.   Is that a felony drug charge?

7 A.   That's -- that's what they say.  But I'm still

8 fighting it.

9      I was drugged, period.  Something was slipped in

10 my drink, and I'm fighting it.

11           MR. HOOKS:  Let's go off the record for

12      a minute.

13      (Wherein, a break was taken from 12:47 p.m. to

14           12:50 p.m.)

15           MR. HOOKS:  Sue, will you go ahead and

16      share the screen?  I think it will be Number

17      4.

18      (Wherein, an off-the-record conversation was

19           held.)

20 BY MR. HOOKS:

21 Q.   Mr. Buck, can you see the screen that's being

22 shared?

23 A.   Yes.

24 Q.   It looks like this is the Sentencing Order

25 electronically filed May 16th of 2022, Logan County

1  Circuit Court, Paris District; do you see that at the

2  top?

3  A.   Yes.

4  Q.   It looks like you are listed as the defender,

5  Darrell Edward Buck; do you see that?

6  A.   Yes.

7  Q.   And I'm just going down the Sentencing Order.

8  Looks like you were charged with:  Possession of drug

9  paraphernalia intent to store; do you see that?

10  A.   Okay.

11  Q.   And it looks like this says this offense is a

12  felony, which occurred December 19, 2021; do you see

13  that on that document?

14  A.   Yes.

15  Q.   Now, help me out a little bit here.  You said you

16  are -- you are fighting this.  You had something

17  slipped and your drink; that is your position, isn't

18  it?

19  A.   I'm -- yeah.  I'm pretty sure that's what

20  happened.  All I know is I had a blackout, and I woke

21  up in jail.  I have no idea what happened.

22  Q.   So you --

23  A.   I've never -- never ever had drugs, done drugs

24  ever.  So I don't know what happened.

25       And I am still going to fight it, yes.

1    Q.   Well, I'm just reading straight off this document

2    here.   It looks like you voluntarily, intelligently and

3    knowingly entered a negotiated plea of guilty to this

4    felony charge?

5    A.   Yeah.   And what I'm fighting is to have it taken

6    off.

7    Q.   Okay.   So you're fighting to maybe have an

8    expungement; is that what you're saying?

9    A.   Right.

10   Q.   But you're not disputing that you pled guilty to

11   this?

12   A.   Well, that's just what my attorney wanted me to

13   do, you know, for the terms at the time that we were

14   given.

15        And that's why I'm still going to fight it.

16   Q.   Did you appeal this order?

17   A.   I'm -- I'm working on all of that right now, sir.

18              MR. HOOKS:   Okay.   Let's go ahead and

19          mark this, I think, Exhibit 2, Sue.

20        (Wherein, Deposition Exhibit 2 was marked.)

21              MR. HOOKS:   We can take this off the

22          screen.

23              THE WITNESS:   Yeah.

24   BY MR. HOOKS:

25   Q.   Other than that charge, Mr. Buck, have you had any

1   other felonies -- or have you been charged with any

2   other felonies in the last 10 years?

3   A.   No.  I've never had a felony.

4   Q.   Other than that one we just discussed?

5   A.   Yeah.  I've never ever done drugs or anything ever

6   in my life; 42 years old.

7   Q.   You have never -- you've never failed a drug test?

8   A.   I've never ever done any hard drugs in my life.

9   So I just -- I don't know what happened that night, you

10  know.

11  Q.   That's not what I asked.

12       I asked if you'd ever failed a drug test?

13  A.   No.

14  Q.   So you -- after you'd served time in jail, you

15  went back to providing your services to Westwind,

16  correct?

17  A.   Correct.

18  Q.   Have you made any social media posts about

19  Westwind or about Mark or Noreen?

20  A.   No.

21  Q.   Do you have a Facebook page?

22  A.   I do.

23  Q.   Twitter -- Twitter account?

24  A.   No.

25  Q.   Any other social media platforms?

1    A.    Instagram.

2    Q.    At the time -- or, scratch that.

3        In 2022, were you driving to and from Westwind's

4 shop?

5    A.    Yes.

6    Q.    Were you using a personal vehicle?

7    A.    Yes.

8    Q.    Did Westwind ever reimburse you for gas?

9    A.    No.

10    Q.    Were they paying the insurance premiums on your

11 truck?

12    A.    No.

13    Q.    Did you ever bring personal tools with you to work

14 at Westwind?

15    A.    Never.

16    Q.    What type of vehicle were you driving to Westwind

17 when you worked there?

18    A.    A Suburban.

19    Q.    What was the make and model?

20    A.    Chevy -- Chevy Suburban.  Chevrolet.

21    Q.    Where did you by it from?

22    A.    From a local car lot, used-car lot.

23    Q.    Do you recall -- do you recall the name?

24    A.    I'm having a brain fart.  I don't -- I don't

25 recall the name of it.  I don't recall the name of it.

```
 1          It was somebody that Mark and Noreen knew.

 2    Q.    John Frank?

 3    A.    John Frank, yes.  That was his name.

 4    Q.    When did you by that Suburban from him?

 5    A.    I don't recall when I bought the Suburban.  I

 6    don't -- I don't recall offhand.

 7    Q.    Did you --

 8    A.    I was also driving a 2016 Jeep Grand Cherokee that

 9    belonged to my wife and the Suburban; those were the

10    two vehicles that I drove there.

11    Q.    Did you by that Suburban on an installment

12    contract?

13    A.    Installment contract?  I was making payments on

14    it, if that's what you're asking.

15    Q.    Were you making weekly payments to Mr. Frank?

16    A.    Yes.

17    Q.    Do you recall what your weekly payment was?

18    A.    I don't recall.  They changed.  They changed a few

19    times, depending on how much I put down.

20    Q.    Do you recall how much you put down on that

21    vehicle?

22    A.    I don't recall.  I don't know.

23    Q.    That Jeep Grand Cherokee, did you buy that from

24    Mr. Frank as well?

25    A.    No.  No.  That's my wife's vehicle from
```

1    California.

2    Q.    During your time at Westwind were you ever

3    involved in a motor vehicle accident?

4    A.    No.

5    Q.    Never wrecked your -- that Jeep?

6    A.    I never wrecked the Jeep.  No, I sure did not.

7    Q.    Never wrecked the Suburban?

8    A.    No, I sure did not.

9    Q.    And, I believe, you stated you had to pay on that

10   Suburban weekly?

11   A.    Yes.

12   Q.    And you were paid from Westwind as well, correct?

13   A.    Correct.

14   Q.    You didn't complain to Noreen about switching over

15   to being an employee and about the taxes, because you

16   couldn't make the payments on your Suburban?

17   A.    No.  I don't recall any kind of conversation like

18   that.  No.

19         The only thing I complained to Ms. Noreen about

20   was not getting my pay to me that she owed me so I

21   could make my payments.

22   Q.    Let's talk a little bit about damages you are

23   claiming in this lawsuit.

24         What all -- what are you making a claim for,

25   Mr. Buck?

1    A.    My attorney is kind of handling that right now.

2    Q.    Okay.  Are you making a claim for overtime wages?

3    A.    I will be, yes.

4    Q.    Are you making a claim for minimum wages?

5    A.    That's something I will have to get to my attorney

6    on.

7    Q.    How are you making a claim for overtime, if you

8    stated you worked 40 hours a week?

9    A.    Because I had to be there at least a half an hour

10   early every day on my time, and leave anywhere from 30

11   minutes to an hour late after getting off.  And that's

12   not my choice.  That's doing what they make us do.

13   That's me standing around waiting on my paycheck every

14   Friday for Ms. Noreen to make it to the shop; to have

15   her conversations with everyone as she's handing one

16   out at a time, and having more of a conversation,

17   handing another one out.  It's things like that that

18   would cut in 30 minutes to an hour of our time every

19   single day, before shift and after shift.

20        And that is something that I should be compensated

21   for.  I shouldn't have to change out everything on my

22   time, you know.  If they want me there at 6:00, then I

23   should be there at 6:00, clock in, change out, get to

24   my workstation.  But, instead, I'm getting there at

25   5:30, 5:15 in the morning on my time to do what they

1    want me to do before I get to my workstation and they

2    actually start paying me.

3    Q.    So you always showed up at 5:30 every morning?

4    A.    Almost every morning, yeah.  And it would vary.

5    Q.    You never showed up late?

6    A.    Late?  On occasion I would be late.  Sure.  But

7    not every day.  I was, you know -- yeah.

8    Q.    Would you ever leave between 6:00 a.m. and

9    2:30 for personal business?

10   A.    There had been -- I'm sure there had been times I

11   had to take off early to take care of something or

12   doctor or dentist or, you know.  There's been times

13   where I've had to leave early, sure.  Not every day.

14   Q.    That 6:00 a.m. period to the 2:30 period, were you

15   able to take lunch?

16   A.    They gave us a 30-minute lunch.  And, if we wanted

17   to leave for lunch, again, we would have to take all of

18   our stuff off, put our clothes back on, take off, come

19   back and wait for them to re-sanitize everything,

20   change -- you know.

21   Q.    Were Mark and Noreen, did they stay in the shop

22   the entirety of from 6:00 a.m. to 2:30?

23   A.    No.  No.

24   Q.    So they wouldn't be supervising you throughout the

25   day?

1  A.   No.

2              MR. HOOKS:   I think I'm about done.

3              Let's take another short, five-minute

4        break.

5              THE WITNESS:   Okay.

6        (Wherein, a break was taken from 1:04 p.m. to 1:09

7              p.m.)

8  BY MR. HOOKS:

9  Q.   Mr. Buck, just a few more questions for you.

10       In your complaint, you filed -- or sought a cause

11  of action for retaliation against Westwind; do you

12  recall making that retaliation charge?

13  A.   I don't know what you mean by retaliation.  I

14  never retaliated against Westwind.

15       But, if you're -- if you're meaning OSHA?

16  Q.   That's correct.  Yes.

17  A.   Okay.  Yeah.  It was never anything to do with

18  retaliation.

19       It had to do with me protecting my -- the

20  safety -- my own safety.  I mean, I told them several

21  times I wasn't safe -- didn't feel safe being hoisted

22  that high up on a forklift, standing on a fork in work

23  boots, like, with no harness, I mean.  And they kept

24  making me do it.  I told them I was going to contact

25  OSHA over it.  It was no secret.  I wasn't retaliating.

1          They retaliated against me, by terminating me for

2    contacting OSHA, so...

3                    MR. HOOKS:   Sue, can you share your

4          screen, OSHA letter.

5    BY MR. HOOKS:

6    Q.   Mr. Buck, can you see this screen?

7    A.   Yes.

8    Q.   It's a letter dated January 11, 2023, addressed to

9    you from the U.S. Department of Labor, Occupational

10   Safety and Health Administration -- which we'll

11   stipulate to as being OSHA.

12          You are able to see the letter, correct?

13   A.   Yes, I can see it.

14   Q.   It looks like they -- they had an investigation

15   into the complaint filed by you against Westwind and

16   Associates on August 12th.

17          And it says you -- you allege the respondent

18   terminated your employment on August 10th because you

19   filed a safety health and complaint with OSHA on August

20   5, 2022; do you see that?

21   A.   I do.

22   Q.   And, just going along on this letter, it states

23   the Secretary of Labor, "acting through his agent, the

24   Regional Administrator for the Occupational Safety and

25   Health Administration finds...  There is no reasonable

1  cause to believe Respondent violated Section 11(c) of

2  the OSHA Act"; do you see that?

3  A.   Yes, I see that.

4  Q.   We're going to scroll down to findings of the

5  investigation.

6  A.   "Retaliated"...

7  Q.   It states "As a result of the investigation, the

8  burden of establishing that Complainant was retaliated

9  against in violation of Section 11(c) of the OSH Act

10  cannot be" maintained [sic]; do you see that?

11  A.   Yeah.

12  Q.   And going to Page 2, it continues, "Respondent had

13  no knowledge of the Complainant's protected activity at

14  the time the decision was made to terminate his

15  employment"; do you see that?

16  A.   Uh-huh.

17  Q.   On Page 2?

18  A.   I'm reading it right now.

19       Yeah, that's false anyways, so...

20  Q.   So the Department of Labor is false in their

21  findings?

22  A.   Apparently.

23  Q.   Well, did you appeal their findings --

24  A.   I mean --

25  Q.   -- did you appeal their findings --

1    A.    -- I know I contacted OSHA before I was

2    terminated.  I know I contacted them before I was

3    terminated; that was the whole reason that they -- they

4    let me go.

5    Q.    Well, did you appeal this decision?

6    A.    I haven't appealed it yet, no.

7    Q.    Well, why not?

8    A.    I don't know, sir.  I've just been busy.  You

9    know, this is -- I'm on a crazy-high-demand

10   construction job out here in Alaska.  And I usually

11   don't even get days off to handle stuff like this.  So

12   it's just been -- it's just been busy, busy ever since

13   I left Westwind, you know.  I -- I don't have a whole

14   lot of free time.  So it's kind of hard, you know.

15   Q.    So you disagree with the Department of Labor's

16   finding that you were not retaliated against?

17   A.    I did not retaliate against them, no.

18          I -- I simply told them that I was going to

19   contact OSHA due to unsafe practices.  You know, I did

20   not --

21   Q.    I understand.

22          But you filed a complaint against Westwind with

23   OSHA.

24          And my question is:  Do you disagree with the

25   Department of Labor's finding, which stated that you

1  were not retaliated against by Westwind?

2  A.    That I was -- yes.  Yes.

3              MR. HOOKS:  Let's mark this as

4         Exhibit 3, I believe.

5      (Wherein, Deposition Exhibit 3 was marked.)

6  BY MR. HOOKS:

7  Q.    Are you seeking a specific dollar amount from

8  Westwind in this lawsuit?

9  A.    Again, that's something that I'm discussing with

10 my attorney still.

11 Q.    So you haven't put any thought into it yourself?

12 A.    I have.  But, again, that's something I'm

13 discussing with my attorney.

14 Q.    Are you claiming -- or seeking recovery for

15 overtime wages from Westwind?

16 A.    Yes.  I'm -- I'm seeking pay for having to come in

17 early and leave late every day that I worked there.

18 Q.    How many hours per week in overtime are you

19 claiming from Westwind -- or seeking to recover from

20 Westwind?

21 A.    Approximately two and a half to three hours.

22 Q.    A week?

23 A.    Yes, sir.

24             MR. HOOKS:  Pass the witness.

25             MR. FORD:  I, actually, don't think I

1          have any questions for you today, Mr. Buck.

2               I -- I'll reserve any questions for

3          trial.

4               THE WITNESS:  Okay.

5               MR. HOOKS:  Thank you, Mr. Buck.

6               THE WITNESS:  Okay.  Thank you.

7     (Wherein, deposition concluded at 1:15 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**C E R T I F I C A T E**

| | |
|---|---|
| STATE OF ARKANSAS | ) |
| | ) SS |
| COUNTY OF SEBASTIAN | ) |

       I, Susan K. Wilcox, Certified Court Reporter for the State of Arkansas, do hereby certify as follows:

       (1) that on July 5, 2023, the witness, DARRELL EDWARD BUCK, was duly sworn by me prior to the taking of testimony as to the truth of the matters attested to and contained therein; (2) that the foregoing pages contain and are a true and correct transcription of the proceedings as reported verbatim by me via Stenomask to the best of my ability and transcribed and reduced to typewriting by myself or under my direction and supervision, and subject to appropriate changes submitted by witness, if any, during his/her requested reading and signing of this deposition according to the Federal Rules of Civil Procedure; (3) that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and that I am not a relative or employee of any attorney employed by the parties hereto; (4) that I am not financially or otherwise interested in the outcome of this action that affects or has substantial tendency to affect impartiality or requires me to relinquish control of an original or copies of a deposition transcript before it is certified, or that requires me to provide any service not made available to all parties to the action; and (5) that I have no contract with the parties, attorneys, or persons with an interest in the action; and that I am not knowingly identified on a preferred provider list, whether written or oral, for any litigant, insurance company, or third-party administrator involved in this matter. This transcript is prepared at request of DEFENDANTS; and all fees are billed directly to DEFENDANTS in compliance with Arkansas Board of Court Reporter Examiners Regulations Section 19.

       Witness my hand and seal this 20th of July, 2023.

SUSAN K. WILCOX
Certified Reporter #629
19 Stoppel Road, Eureka Springs, AR 72632